**Irving J. HAYUTIN and Sima B. Hayutin, Petitioners-Appellants,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee (three cases).***

**No. 73–1756.**

United States Court of Appeals, Tenth Circuit.

Argued July 10, 1974.

Decided Dec. 12, 1974.
Rehearing Denied Jan. 17, 1975.

---

* Hayutin (three cases), 73–1757, 1765, 1767, 1768; Estate of Shaw (four cases), 73–1758, 1762, 1770, 1772; Northwest Water Corp. (three cases), 73–1759, 1763, 1771; S and H Builders, Inc. (three cases), 73–1760, 1761, 1773; & Harrison (two cases), 73–1766, 1774 & 1775, v. Commissioner of Internal Revenue.

Stanley L. Drexler, Denver, Colo., for petitioners-appellants and cross-appellee in all cases except Nos. 73–1774 and 73–1775.

Martin P. Miller, Littleton, Colo., for petitioner-appellant and cross-appellee in Nos. 73–1774 and 73–1775.

Carleton D. Powell, Tax Div., Dept. of Justice (Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks and Michael L. Paup, Tax Div., Washington, D. C., on the brief), for respondent-appellee and cross-appellant in all cases.

Before HILL and SETH, Circuit Judges, and SMITH,* District Judge.

HILL, Circuit Judge.

This action involves seventeen appeals from decisions of the United States Tax Court, redetermining federal income tax deficiencies for the years 1954 through 1963. The appellants are: Irving J. and Sima B. Hayutin; Arthur B. and Sylvia C. Hayutin; Estate of Eugene E. Shaw, Deceased, Irving J. Hayutin, Special Administrator; Northwest Water Corporation; S & H Builders, Inc.; Sylvia C. Harrison (formerly Sylvia C. Hayutin); and Nelda B. Isbell (formerly Nelda B. Shaw). Additionally, the appellee Commissioner of Internal Revenue has filed two protective cross-appeals.

Some of the issues are identical and relate to the tax liabilities of several appellants. Others concern the tax liability of only a single appellant. Because of this, and because of the complex nature of the action, pertinent facts will be recited as they relate to particular issues rather than individual appellants.

## I. PAYMENTS SUBSEQUENT TO DIVORCE

Sylvia and Arthur Hayutin were married in 1945, while Arthur was serving in the U. S. Army. At the time of their marriage, Arthur's assets were minimal. He had $1,000 in bonds and a small amount of cash, but owned no automobile, no real estate, and no securities. Sylvia, who had been employed as a social worker, had saved approximately $3,000 from her earnings and from parental gifts. All of this money was placed in the couple's joint checking account. Additionally a $5,000 bond, a wedding gift from Sylvia's parents, was cashed and placed in the joint account.

The Hayutins moved to Denver, Colorado, when Arthur was released from the Army. He attended law school and Sylvia continued to work, placing her earnings in their joint account. Additionally, while Arthur was attending law school Sylvia's parents gave her $60 per month to be used in paying rent. Sylvia terminated her employment during her

---

* Honorable Talbot Smith, Eastern District of Michigan, sitting by designation.

first pregnancy, and thereafter performed all the duties of a housewife.

During the years 1945–60, Sylvia and the children received over $12,000 in gifts from Sylvia's parents. These funds were spent on living expenses or were put in bank accounts or trusts for the children. With the exception of $1500 used by Arthur to purchase a partnership interest in his brother's law practice, and $2000 used by him in an unsuccessful business venture, Sylvia did not invest any of the money she received from earnings or parental gifts in business ventures in which Arthur had an interest.

Sylvia and Arthur separated in April, 1961, and Sylvia subsequently instituted divorce proceedings. The divorce was granted that October. Thereafter, Arthur agreed to pay Sylvia $500 per month in temporary alimony and she agreed to support herself and the children from these funds.

At the time of the divorce Sylvia had no legal interest in Arthur's business assets. She did have an interest in certain family household goods, an interest in the Sylvia C. Hayutin trust in which she was the beneficiary, and a one-half interest in two family residences.

After mesne negotiations (reflecting an intent to provide to some extent support for Sylvia and the children), Sylvia and Arthur in May, 1962, entered into a property settlement agreement. This "Stipulation And Agreement" recited that it was binding "with respect to the matter of custody of minor children, child support, permanent alimony, attorney's fees and expenses" and provided for a lump sum settlement to Sylvia of $198,000.

Arthur agreed to transfer to Sylvia his one-half interest in one residence, his interest in a $5,000 note, and his interest in miscellaneous household goods in Sylvia's possession. The value of the first two items was recited to be $35,000. The remaining $163,000 was to be paid in monthly installments over an 18 year period, beginning June 1, 1962. Sylvia agreed to transfer to Arthur her one-half interest in the second residence, her interest in the income from the Sylvia C. Hayutin trust and in certain stock held therein, and her interest in miscellaneous household goods in Arthur's possession.

The agreement further provided, inter alia, that Sylvia would waive all claims to alimony and that she would support and maintain the children. Additionally, she was to be maintained as the primary beneficiary on Arthur's life insurance policies to secure payments due under the agreement. Finally, the agreement provided that Arthur could prepay, in any amount, the $163,000.

Pursuant to the agreement Arthur made seven $700 payments to Sylvia in 1962. On his 1962 federal income tax return he deducted over $19,000 as alimony. Sylvia, on her 1962 federal income tax return, reported only the $2,500 temporary alimony she received from Arthur prior to the settlement agreement.

The Internal Revenue Service (IRS) assessed deficiencies against Sylvia for unreported taxable alimony, and against Arthur, disallowing his alimony deduction on the grounds he had not established the payments constituted deductible alimony.

Both Sylvia and Arthur petitioned the United States Tax Court for a redetermination of deficiencies. In essence, Sylvia contended the property settlement agreement was a division of property between co-owners and therefore not includible in her gross income. Arthur, on the other hand, contended his payments under the settlement agreement constituted an obligation incurred by reason of the marital relationship and was therefore deductible from his gross income.

The Tax Court determined that the installment payments were not made to acquire Sylvia's interest in Arthur's property because, under Colorado law, her interests did not rise to the level of property rights. However, it found Sylvia did have actual ownership rights in some items of property, the value of which was unclear, thus requiring each

payment to be allocated between support and property rights.

Finding the preliminary agreement between Arthur and Sylvia, which provided for $500 per month in temporary alimony, as convincing evidence of the amount they considered essential for her support, the Tax Court held (1) $500 of each of the seven $700 payments made in 1962 was for support and was deductible by Arthur and taxable to Sylvia; and (2) the remaining $200 of each of those payments was made to acquire Sylvia's property rights and was neither deductible by Arthur nor taxable to Sylvia.

On appeal, Sylvia contends the total amount of each payment is a non-taxable division of property and Arthur contends the total amount of each payment constitutes deductible support.

Title 26 U.S.C. § 215 [1] permits a husband to deduct from his gross income amounts which he has paid to his wife during the taxable year if such amounts are includible in her gross income under 26 U.S.C. § 71.[2]

However, § 71(c)(1) provides that installment payments, the principal sum of which is specified in terms of money or property in the agreement, shall not be treated as periodic payments.

Pointing to the lump sum provision in the settlement agreement, Sylvia contends Arthur's payments are not periodic and therefore not entitled to § 71 treatment. This position ignores § 71(c)(2), which provides that if the principal sum is to be paid over a period more than ten years, payments will be considered periodic under § 71(a) (to the extent they do not exceed 10 percent of the principal sum in any one taxable year of the wife), notwithstanding § 71(c)(1).

Nevertheless, Sylvia argues that because the agreement contains a prepayment option the principal sum could be paid within ten years, and therefore Arthur's payments are not periodic.

---

1. 26 U.S.C. § 215 provides: "In the case of a husband described in section 71, there shall be allowed as a deduction amounts includible under section 71 in the gross income of the wife, payment of which is made within the husband's taxable year. No deduction shall be allowed under the preceding sentence with respect to any payment if, by reason of section 71(d) or 682, the amount thereof is not includible in the husband's gross income."

2. 26 U.S.C. § 71 provides in part:

(a) General rule.—

(1) Decree of divorce or separate maintenance.—If a wife is divorced or legally separated from her husband under a decree of divorce or of separate maintenance, the wife's gross income includes periodic payments (whether or not made at regular intervals) received after such decree in discharge of (or attributable to property transferred, in trust or otherwise, in discharge of) a legal obligation which, because of the marital or family relationship, is imposed on or incurred by the husband under the decree or under a written instrument incident to such divorce or separation.

(2) Written separation agreement.—If a wife is separated from her husband and there is a written separation agreement executed after the date of the enactment of this title, the wife's gross income includes periodic payments (whether or not made at regular intervals) received after such agreement is executed which are made under such agreement and because of the marital or family relationship (or which are attributable to property transferred, in trust or otherwise, under such agreement and because of such relationship). This paragraph shall not apply if the husband and wife make a single return jointly.

(c) Principal sum paid in installments.—

(1) General Rule.—For purposes of subsection (a), installment payments discharging a part of an obligation the principal sum of which is, either in terms of money or property, specified in the decree, instrument, or agreement shall not be treated as periodic payments.

(2) Where period for payment is more than 10 years.—If, by the terms of the decree, instrument, or agreement, the principal sum referred to in paragraph (1) is to be paid or may be paid over a period ending more than 10 years from the date of such decree, instrument, or agreement, then (notwithstanding paragraph (1)) the installment payments shall be treated as periodic payments for purposes of subsection (a), but (in the case of any one taxable year of the wife) only to the extent of 10 percent of the principal sum. For purposes of the preceding sentence, the part of any principal sum which is allocable to a period after the taxable year of the wife in which it is received shall be treated as an installment payment for the taxable year in which it is received.

This interpretation of § 71(c)(2) is too restrictive. By its own language, it applies to payments that *may* be paid over more than a ten year period. Moreover, the prepayment option is only a contingency which is of no consequence unless it occurs.[3] Since Arthur's payments may be made over a period exceeding ten years they are periodic under § 71(c)(2).

■ In addition to being periodic the payments must, to come within § 71, arise out of a family or marital relationship in recognition of the general liability to support a wife or family, and must not be made as an exchange for the wife's property rights. 26 U.S.C. § 71(a)(1). *See also* McCombs v. CIR, 397 F.2d 4 (10th Cir. 1968). Determination of this question depends upon applicable state law and the facts and circumstances surrounding the agreement. United States v. Davis, 370 U.S. 65, 82 S.Ct. 1190, 8 L.Ed.2d 335 (1962); Collins v. CIR, 412 F.2d 211 (10th Cir. 1969).

This Court answered the question in Pulliam v. CIR, 329 F.2d 97 (10th Cir. 1964), cert. den'd, 379 U.S. 836, 85 S.Ct. 72, 13 L.Ed.2d 44, where we said: "Under Colorado law the wife's rights during marriage do not vest in her an ownership of any part of the husband's property. Thus the liability of the husband for support of his wife is more in the nature of a personal obligation." However in In Re Questions Submitted by United States District Court in Civil Action Imel v. United States, 517 P.2d 1331 (Colo. 1974), the Colorado Supreme Court stated: "We are here holding that there is an exception to this rule, which is that vesting takes place at the time of the filing of the divorce action."

*Imel* was an original proceeding before the Colorado Supreme Court in response to a question submitted by the federal district court in an action for refund of a capital gains tax paid on appreciated property transferred to a wife under a divorce settlement decree. The question submitted was:

> When, under 1963 C.R.S. 46–1–5 [or under 1963 C.R.S. 46–1–13 as amended in 1971]
>
> (a) a property settlement agreement is entered into providing for a transfer of property from husband to wife in acknowledgment of the wife's contribution to the accumulation of the marital estate, or,
>
> (b) a decree of the divorce court requires such transfer because of the wife's contributions to the accumulation of the family estate, and,
>
> (c) the transfer is not made in satisfaction of the husband's obligation for support,
>
> is the transfer a taxable event for purposes of federal income taxation?

The Colorado Supreme Court replied:

> We answer in the affirmative that, under Colorado law, the transfer involved here was a recognition of a "species of common ownership" of the marital estate by the wife resembling a division of property between co-owners. We answer in the negative whether the transfer more closely resembles a conveyance by the husband for the release of an independent obligation . . . ..

■ Relying on *Imel,* Sylvia argues Arthur's payments must be viewed as a division of property between co-owners. Her reliance, however, rests upon the characterization placed upon the transfer by the Colorado Supreme Court. Such a characterization is not controlling for tax purposes. 5 Mertens, L.Fed.Income Tax. § 31A.02 (Zimet & Ness rev. 1969). Rather, consideration must be given to the true nature of the transfer under Colorado law. When so viewed, it is apparent that Colorado places a burden upon the husband's property rather than making the wife a part owner thereof.

---

**3.** "The Regulations provide that where the payments are to be made for more than a qualifying 10-year period but they are also subject to contingencies . . . the payments are considered to be periodic. . . ." 5 Mertens, L.Fed. Income Tax. § 31A.03 (Zimet & Ness rev. 1969). *See also* 26 C.F.R. § 1.71–1(d)(2).

A husband's property, in Colorado, is basically free from any vested interest of the wife, except her inchoate rights which vest upon the filing of the divorce action. *See, e. g.,* In Re Questions Submitted by the United States District Court in Civil Action Imel v. United States, *supra.* Such rights are contingent upon divorce, are in an undetermined amount of property, and are analogous to those of a wife who can establish a resulting trust. The wife cannot exercise her right to the property during the marriage.

Colorado's divorce laws[4] provide that the court will divide the marital property in fair, just and equitable proportions. The amount of property each party is to receive is discretionary with the court. Kraus v. Kraus, 159 Colo. 331, 411 P.2d 240 (1966). In the exercise of its discretion the court may consider, inter alia, the value of the estate to be divided, the financial condition of the parties, the ability of each spouse to earn money, how the property was acquired, the parties' health and ages, the contribution of each party to the marital property, and all other pertinent facts and circumstances. *See, e. g.,* Kraus v. Kraus, *supra.*

These factors are inconsistent with the idea of co-owned property. A co-owner's rights in property to be divided would depend not upon marital factors and the right to a "just", "equitable", or "fair" share, *see, e. g.,* Wiles v. CIR, 499 F.2d 255 (10th Cir. 1974), cert. den'd, 419 U.S. 996, 95 S.Ct. 310, 42 L.Ed.2d 270, but would depend upon actual ownership rights. Thus, we find that although the payments in question may be characterized by Colorado courts as a property settlement they are in fact payments in satisfaction of a marital obligation and not part of a division of marital property.

However, the record shows Sylvia did have actual ownership rights in some items of property and to that extent Arthur's payments to her must have been made to acquire those rights. The Tax Court reached the same conclusion and made an allocation based on the facts in evidence. Our review of the record discloses a rational basis for its decision, and we affirm.

## II. LAND TRANSFERS

### A. Barnes-Shaw Tract

Honeymoon Manor, Inc. (Honeymoon), a Colorado corporation, was organized in 1949 to engage in the business of subdivision development. It was operated by Arthur, his brother Irving Hayutin, and Eugene Shaw, who each owned one-third of the capital stock.

Shaw (now deceased) and Roy Barnes owned, in equal undivided interests, 168.7 acres of unimproved land near the city of Westminster, Colorado. On January 1, 1952, they sold this land [hereinafter referred to as the Barnes-Shaw tract] to Honeymoon for $30,000. Because Honeymoon had only a nominal net worth and no cash, the sales contract provided for no down payment. It did provide for annual installments of $6,000 with 5 percent interest on any unpaid balance, the first payment to be due one year from the date of sale.

Honeymoon purchased the Barnes-Shaw tract because Westminster had earlier indicated it was going to extend the city limits, and Honeymoon thought the tract would be annexed within one year. Annexation would provide the tract with improvements, such as water and other utilities, and would allow Honeymoon to plat the tract for subdivision, sell it at a highly appreciated value, and reap a large profit.

Westminster, however, decided against a large scale annexation. This decision was based in part on the lack of available water for any newly annexed area. Westminster's water supply came from wells which provided only enough water for the town's needs at that time. Honeymoon negotiated with Westminster for

4. *See* 1963 C.R.S. § 46–1–5, as amended in 1971, C.R.S. § 46–1–13.

annexation throughout the remainder of 1952, but was unsuccessful. This was a major setback to Honeymoon because Federal Housing Administration or Veterans Administration approval of the tract for builder-buyers was dependent upon annexation and its attendant improvements.

Because it was infeasible to develop the tract Honeymoon tried to sell a one-third interest in it at $900 per acre. The prospective purchaser considered the price reasonable but nevertheless rejected the offer because of the uncertainty of obtaining annexation and water.

Having unsuccessfully tried to annex and/or sell the Barnes-Shaw tract, Honeymoon found itself without the necessary funds to make its January, 1953, payment on the tract. At a board of directors meeting on December 20, 1952, Irving announced that he would make the payment if Honeymoon would sell the tract to himself, Arthur and Shaw. On January 5, 1953, they purchased the tract for $144,000. Pursuant to the sales contract the purchase price was reduced by $27,000 in outstanding encumbrances and by $5,560 in cash advances made to Honeymoon. Annual installments of $6,140, with 4 percent interest on any unpaid balance, were to commence on July 1, 1954. No deed of trust was given to Honeymoon. This contract was subsequently modified on May 3, 1954, and again on January 28, 1957, and made less burdensome.

Thereafter, the three men unsuccessfully attempted to sell the tract, offering it to one prospective purchaser for $900 per acre and to another for $1,250 per acre. Westminster then decided to extend its city limits. Upon learning of its annexation plans Irving, Arthur and Shaw again requested annexation of their tract. They submitted plans and specifications, represented that they would obtain street lighting, and said they would build on the tract if it was annexed. In March, 1953, Westminster indicated it would annex 54 acres of the tract and did so in June, 1953.

Based on Westminster's plan to annex their tract, Arthur, Irving and Shaw, on March 27, 1953, incorporated S & H Builders, Inc. (Builders) to develop and build on it. Incorporation of Builders was not necessary, as Honeymoon already was in existence, but was an admitted attempt by the three men to escape personal liability via a corporate shell. Shaw owned one-third of the corporate stock. Irving and Arthur placed part of their collective two-thirds interest in various trusts. Builders was capitalized with only $108, representing 108 shares of stock. No further capital was invested. From its inception, Builders had a surplus deficit because it had borrowed money from Hayutin & Hayutin, a law partnership between Irving and Arthur, for paid-in capital and various obligations. It was thought that the turnover of money flowing into Builders from the sale of houses would generate working capital, and that land, offsite improvements, and construction of homes would initially be secured on credit without the need for working capital.

On April 4, 1953, the three men conveyed the 54 acre portion of the tract to be annexed to Builders for a purchase price of $160,000, plus one-half of Builders' profits from the resale of lots. Ten percent was to be paid by October 15, 1953, without interest, and annual payments of five percent were to commence on March 1, 1954. Interest of 3½ percent was to be paid on the unpaid balance of payments. Finally, Builders received an option to purchase additional acreage. This contract was subsequently modified five times.[5]

5. An April 29, 1953, modification provided that Builders would assume the $27,000 balance owing to Shaw and Barnes. A December 12, 1953, modification was entered into because Builders was unable to make a contract payment due shortly thereafter. The payment was waived and a deferred payment schedule was established. A February 27, 1954, modification recited that Builders was unable to make a current deferred payment. Deferred payments under the prior modification were eliminated and a new payment system was established. A fourth modification was made on June 17, 1954, because payment

The building of homes commenced on the 54 acres in April, 1953, prior to formal annexation. Builders supplied the land and (borrowed) funds and a contractor supplied labor and some material. As houses were built and sold there was a partial release of security. Each time a house was built adjoining lots increased in value. In its first fiscal year of operations, ending February 28, 1954, Builders operated at a deficit.

On June 17, 1954, Arthur, Irving and Shaw transferred 59 acres of the Barnes-Shaw tract to Builders for $172,500. The sales contract provided for payments of $6,900 by December 15, 1954; $5,175 by March 15, 1955; and then semiannual payments of $5,175. Westminster was requested to annex this acreage but declined to do so for lack of available water. Builders had already built 31 homes on this tract, on the periphery of the previously annexed acreage, which would now be without water. Westminster denied a petition for annexation of these 31 lots but thereafter granted the petition when Builders committed itself to obtain water for them. No adjustments in the sales price pertaining to the 59 acres was given to Builders because of the unsuccessful annexation attempt.

The remaining 56 acres of the Barnes-Shaw tract was sold to Builders on February 14, 1955, for $126,000. The sales contract provided for a payment of $6,300 by July 15, 1955, and thereafter annual payments of $6,300 with 4 percent on any unpaid balance. No deed of trust was executed to secure the payment of the purchase price. As with the previous contracts, this one was modified on November 20, 1956.

### B. Wyse Tract

In June, 1952, Irving, Arthur and Shaw acquired an option to purchase 112 acres of unimproved land from Donna and J. C. Wyse. The Wyses were in need of money at the time and the three

men took a second mortgage on the land, obtained a $10,000 bank loan with the mortgage as security, and gave the Wyses the money. The option was taken because the land [hereinafter referred to as the Wyse tract] was contiguous to the Barnes-Shaw tract and was expected to be annexed by Westminster.

The option to purchase was exercised on July 2, 1953. The Wyses executed deeds transferring the tract to GAI Company (GAI), a nominee entity owned by and acting on behalf of Irving, Arthur and Shaw, for $60,000. The tract subsequently was transferred to Builders on or about February 18, 1955, for $225,000. The contract recited, inter alia, that the expense, difficulty and uncertainty of obtaining a water supply had become a major factor in the development of acreage for subdivision purposes. No deed of trust was given. As with previous sales contracts, this one was modified on November 20, 1956.

### C. Keller Tract

On April 14, 1954, Irving, Arthur and Shaw, through GAI, acquired an option to purchase 296 acres of unimproved land, contiguous to the Barnes-Shaw tract, from G. E. and Mildred Keller. GAI exercised the option to purchase the land [hereinafter referred to as the Keller tract] on August 18, 1954, and purchased it for $150,000. H & S Land Company, another nominee entity held by the three men, was subsequently given an option to purchase. The tract thereafter was sold to Builders for $450,000 plus partial assumption of the option obligation. No deed of trust was given. This sales contract was modified on November 20, 1956.

The record indicates that none of the contracts, or subsequent modifications, contained late payment or default provisions, that payments were irregularly made under the contracts, and that no action was taken thereon.

by Builders of resale profits would cause it to operate at a loss. Resale profits were waived. A final modification was entered into on November 20, 1956, because of the

difficulty in obtaining water for subdivision development. The modification recited that Builders' unpaid balance was over $92,000, and established payment schedules therefor.

The land transfers were characterized as sales, the money therefrom being reported as ordinary income for federal income tax purposes. Additionally, deductions were taken for interest payments. The IRS, however, assessed deficiencies on the grounds the land transfers to Builders were contributions to capital. It also determined that Builders acquired Arthur's, Irving's and Shaw's basis in the land. It further determined the interest deductions claimed by Builders relating to land contracts were not allowable, and that amounts received by Arthur, Irving and Shaw pursuant to the contracts constituted dividend income.

Arthur, Irving, Shaw and Builders petitioned the Tax Court for a redetermination of deficiencies.[6]

The Tax Court found, inter alia, (1) the land transfers to Builders, which was undercapitalized, were contributions to capital; (2) sales prices to Builders were not based on good-faith appraisals of value; (3) Builders' basis in the Barnes-Shaw tract, the Wyse tract and the Keller tract was $42,000, $60,000 and $150,000, respectively; (4) interest deductions claimed by Builders were not allowable; and (5) monies received by Arthur, Irving and Shaw pursuant to the land contracts constituted dividend income.

On appeal, appellants attack as clearly erroneous the Tax Court's finding that Builders' capital structure was unrealistic, a factor indicating that a transfer is a contribution to capital. *See, e. g.*, Burr Oaks Corp. v. CIR, 365 F.2d 24 (7th Cir. 1966), cert. den'd, 385 U.S. 1007, 87 S.Ct. 713, 17 L.Ed.2d 545 (1967). Builders was capitalized with only $108 and the record does not disclose a further investment of capital. Such a small amount of capitalization appears to be extremely thin in view of the fact Builders purchased land at contract prices totalling over one million dollars. Some of the sales contracts provided either for no down payment or no interest on the first payment. Moreover, Builders often was

unable to make scheduled or rescheduled payments. This evidence is sufficient to justify the Tax Court's determination that Builders was inadequately capitalized.

However, appellants argue that the first transfer to Builders, if viewed as a contribution to capital, cured its undercapitalization. Subsequent transfers, they contend, cannot therefore be treated as contributions to capital. Such a contention ignores the fact that Builders never became adequately capitalized. It operated at a loss the first year and often was unable to make payments on its land contracts. A June 17, 1954, modification, for example, stated in part:

> WHEREAS the portion of profits to be paid as a part of the purchase price of the first sale . . . if paid, will cause purchaser to operate at a loss.
>
> . . .
>
> WHEREAS purchaser is presently unable to make payments required by option contract, without seriously impairing its working capital. . . .

Moreover, undercapitalization is only one of the factors to be considered in determining whether a transfer is a contribution to capital. 4A Mertens, L.Fed. Income Tax. § 26.10c (1972).

A second factor to be considered is whether the price of the properties transferred was disproportionate to their fair market value. The Tax Court found that the appellants exaggerated the value of the properties, and that land sales were arranged at prices and on terms that coincided with their preferences. Appellants contend this determination is erroneous. They testified as to their unsuccessful attempts to sell the land in question for prices ranging from $900 per acre to $1,250 per acre in an effort to show it was not overvalued. Additionally, one prospective buyer who was offered a one-third interest in the

---

6. Sylvia, Sima and Nelda also were petitioners, because they filed joint returns with their husbands.

Barnes-Shaw tract for $900 per acre testified that the price was not unreasonable. A real estate appraiser, qualified as an expert, also testified on behalf of appellants. He stated that the land in question, with the potential of annexation, sewage and water facilities, was worth $1500 to $3000 per acre. His valuations, however, were not based upon an appraisal of the specific property but upon a familiarity with the general area.

The Tax Court found more convincing the testimony of the government's expert witness, Joseph Farber, a real estate appraiser. Farber obtained his appraisals by considering comparable land sales within comparable periods of time, and then making necessary adjustments. He examined some 100 different land sales occurring between 1951 and 1955, finding only 11 to be comparable. In making necessary adjustments he considered date of sale, size of property, sales price, location of property, whether it had water for residential development, soil condition, topography, improvements, zoning, highest and best use, and a history of the property.

Based upon these considerations, Farber determined the properties' fair market value at the actual time of sale to be:

- (a) Barnes-Shaw Tract $ 42,000
- (b) Wyse Tract 60,000
- (c) Keller Tract 150,000

The Tax Court accepted these valuations and affixed them as Builders' basis in the properties.

Appellants argue Farber's appraisal was premised on the unavailability of water when the evidence established annexation was expected and water would be available. This assertion is without merit. The record discloses that annexation and water were not certainties or even probabilities, but only speculative. A prospective purchaser in 1952 refused to buy part of the Barnes-Shaw tract because of the tract's water and annexation problems. Moreover, at the time Builders purchased the Barnes-Shaw tract water was not available.

The chairman of Westminster's planning commission in 1952–56 testified that the city's water supply was a considerable problem in 1952, and that its water taps were "getting dry" in 1953. Westminster's water supply, he stated, was adequate only for the needs of the city as it then existed. Arthur testified that the increased values of the Barnes-Shaw tract were based in part on "a nebulous hope and a belief that somewhere along the line we would be able to work out annexation." He also stated that, at the time the Keller tract was purchased, "there was only a strong potential for water rather than an absolute guarantee." And, Irving stated that at one point in time he had given up hope of obtaining annexation. Moreover, the November 20, 1956, modification to the land contracts stated that the difficulty and uncertainty of obtaining a water supply had become a major factor in the development of land for subdivision purposes. Based on this evidence we believe the Tax Court correctly determined that the land was overvalued.

Another factor to be considered in determining whether the transfers in question were contributions to capital[7] is whether payments made by a vendee corporation were dependent upon the success of an untried, undercapitalized business with uncertain prospects. Here, payments clearly were dependent upon Builders' success. This is evidenced by the many modifications, waiver of payments when Builders was unable to make scheduled contract payments, the establishment of deferred payments, and a modification recitation that payment by Builders of resale profits would cause it to operate at a loss.

7. For a list of factors, *see, e. g.,* Burr Oaks Corp. v. CIR, 365 F.2d 24 (7th Cir. 1966), cert. den'd, 385 U.S. 1007, 87 S.Ct. 713, 17 L.Ed.2d 545 (1967); Sun Properties, Inc. v. United States, 220 F.2d 171 (5th Cir. 1955); 4A Mertens, L.Fed. Income Tax. § 26.10c (1972).

The record does not disclose that the land sale contracts in question contained late payment or default provisions, or that the vendors ever attempted to enforce payment when default occurred. Instead, modifications waived scheduled payments and established deferred payment schedules. While a reasonable extension of time for payment in and of itself is not questionable, Builders' failure to make principal payments or to keep up with the modified payments are two more factors indicating a capital contribution. *See, e. g.,* Sayles Finishing Plants, Inc. v. United States, 399 F.2d 214 (U.S.Ct.Cl.1968).

█ Other factors present here which indicate a capital contribution are the fact the noteholders (Arthur, Irving and Shaw) were the actual promoters of Builders, the fact they would bear the principal loss if Builders failed, and the fact they had substantial control over Builders.

Based upon this evidence we believe the Tax Court's determinations with respect to this issue are correct.

### III. DISTORTION OF INCOME

During the fiscal year ending February 29, 1956, Builders sold 23 houses having a total sales price of $289,750 and also sold land having a total sales price of $376,740. Thus, its total sales amounted to $666,490.[8] In preparing its federal income tax return for that year, however, Builders reported gross receipts of only $652,790 and cost of operations as only $586,124.67. The IRS sent a statutory notice of deficiency to Builders, which stated in part:

Examination of your books and records discloses that the sale of houses for the fiscal year ended [*sic*] Feb-ruary 29, 1956, totalled $289,750.00. Your tax return reports sales of only $276,050.00. Therefore, your taxable income is increased by $13,700.

Builders petitioned the Tax Court for a redetermination of deficiencies. At trial Builders did not dispute the fact it had omitted $13,700 from its return. It did, however, contend it "should not be charged with $13,700 in omitted sales unless costs of approximately 90 per cent are matched against sales." It argued that if total costs for 1954, 1955 and 1956 were subtracted from the total sales for the same years, then gross profits per its return for the year ending February 28, 1956, would have differed with gross receipts for the same year as stated on its worksheet by only $68.82. If matching cost deductions were offset, it contended, and proportionately realigned, there would be no understatement of income.

The Tax Court sustained the deficiency assessment, and Builders appeals. It argues the Tax Court's decision forces it to pay tax on total sales without allowing it an offset for costs of sales. Such a result, it is asserted, constitutes a tax on return of capital and violates the Sixteenth Amendment to the United States Constitution.[9]

█ While Builders' conclusion that amounts received as a return of capital are not taxable income is correct, *see* 1 Mertens, L.Fed. Income Tax. § 5.06 (Zimet, Stanley & Kilcullen rev. 1969), the basis of its argument, that income and costs may be pooled or bunched over a period of years to determine the tax liability for any one of these years, is incorrect. The federal income tax law is based upon an annual accounting period concept. 2 Mertens, L.Fed. Income Tax. § 13.01 (Zimet & Stanley rev. 1967). A

---

8. These figures are reflected on worksheet records prepared by Builders' accountant after the IRS commenced its investigation and audit. The accountant reconstructed sales and costs of sales for the fiscal years ending February 28, 1954, and February 28, 1955, and February 28, 1956. Such reconstruction was necessitated by the fact Builders kept no formal books or records during these years, preparing its federal income tax returns primarily from checkbook records.

9. U.S.Const. amend. XVI provides: "The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration."

taxpayer must compute his tax liability for each accounting period, or "taxable year", on the basis of facts existing at the end of that period. 26 U.S.C. § 441. *See also* 26 C.F.R. § 1.441–1. In other words, income must be reported, and deductions taken, for the period which is the proper taxable year under the method of accounting used,[10] and no other, to reflect the taxpayer's true economic status for that particular year. *See* 26 C.F.R. §§ 1.451–1(a) and 1.461(a)(1).

 In considering Builders' tax liability for the year in issue, then, only tax events properly attributable to that year are relevant. Tax events of previous years cannot be used to reduce its income for the year in issue. *See* 26 C.F.R. § 1.461–1(a)(3)(i). In this context, the record shows Builders failed to report $13,700 additional income for the year in issue; it does not, however, show a corresponding failure to report additional offsetting costs or that any portion of the $13,700 is represented by a return of capital. Thus, the additional tax imposed is a tax on income and not a return of capital, and does not violate the Sixteenth Amendment.

## IV. CURVE TAVERN STOCK

S-H Investment (Investment) is a partnership between Irving, Arthur and Shaw. It was organized in 1951, with its principal place of business in Denver, Colorado, to make loans and investments. In 1951 it purchased 25 percent of the stock in Curve Tavern, Inc. (Tavern), a corporation engaged in the retail liquor business. Of the remaining stock, 25 percent was owned by Matthew Raia and 50 percent was owned by T. W. Burleson. In August, 1956, Eugene Petrino approached Irving with an offer to purchase all of Tavern's capital stock and the real estate upon which the business was located for $90,000. Petrino

was aware that Investment did not own all of Tavern's stock and/or real estate but he wanted Irving to arrange a "package deal".

Investment subsequently purchased Raia's stock for $4,600, Burleson's stock for $15,000, and the real estate for $50,000. Immediately thereafter Petrino purchased all of the stock and the real estate for the previously agreed upon price of $90,000. Of this amount $40,000 was attributable to the stock and $50,000 to the real estate. In addition to transferring Tavern's capital stock and real estate, Investment, as the "consolidating seller", was required to liquidate all of Tavern's outstanding obligations and resolve a lawsuit instituted by Burleson against Tavern (Burleson dismissed the suit upon payment of the $15,000 for his stock).

Investment liquidated Tavern's debts out of the gross sale proceeds and realized a profit from the transaction. In its partnership information return for the taxable year ending March 31, 1957, Investment reported no gain from this sale. Nor did the partners report a gain in their individual tax returns for the 1956 taxable year.

The IRS determined that each partner realized a long term capital gain from the sale of Tavern stock acquired by Investment in 1951 (25 percent), and a short term capital gain from the sale of Tavern stock acquired in 1956 (75 percent). Accordingly, it treated $10,000 of the $40,000 sales price for the stock attributable to the 25 percent interest, and $30,000 of the sales price as attributable to the 75 percent interest. It also determined that no gain resulted from the sale of the real estate because it was sold for a price equal to Investment's basis in the land. Deficiencies were assessed against the partners, and Sylvia and Sima, and they petitioned the Tax

---

**10.** Builders operates on the accrual method of accounting. Under this method income is to be included for the taxable year in which all events have occurred which fix the right to receive income. Deductions are to be taken for the taxable year in which all events have occurred which establish the event giving rise to such deduction. *See, e. g.,* 26 C.F.R. § 1.446–1(c)(1)(ii).

Court for a redetermination of deficiencies. There, they contended Investment was a mere conduit in the sale of the 75 percent stock interest, which was sold at cost, and that any gain realized from the transaction should be attributed to Investment's original 25 percent stock interest as a long term capital gain. The IRS contended Investment's original 25 percent interest, which was held longer than six months, was a long term capital gain. It also contended that the 75 percent stock interest, which was held for less than six months, was a short term capital gain. *See* 26 U.S.C. § 1222(1) and (3). The Tax Court upheld the IRS' determination.

▮▮▮ It is undisputed that 25 percent of the stock was held by Investment more than six months, and that 75 percent of the stock was held less than six months, and that any amounts realized from the sale of such stock are capital gains. Under these facts the IRS' determination is prima facie correct, and appellants bear the burden of proving otherwise. The record, however, does not support appellants' contention. It shows that Investment acquired ownership of the stock at a set price which was not dependent upon the amount of money to be obtained from Petrino. Evidence of this nature is inconsistent with the theory that Investment was merely a conduit for the sale.

Nor does the evidence establish, as it does in the case of the real estate, that the 75 percent stock interest was to be sold to Petrino separately at a specified stated price. He paid $40,000 for a 100 percent interest in Tavern, which interest was owned by Investment at the time of the sale. The record does not disclose an understanding between the parties, or any provision in the sales agreement, that this $40,000 was to be broken down so that a specified amount was being paid for a 75 percent stock interest and another specified amount for the 25 percent stock interest.

There is no logical reason, other than tax avoidance, for such a breakdown since Investment was to receive all the sale proceeds and Petrino was to receive all the stock.[11]

Appellants have failed to produce any evidence tending to disprove the government's theory. Accordingly, the Tax Court's determination as to this issue is affirmed.

## V. NORTHWEST WATER CORPORATION

Northwest Water Development Corporation (subsequently changed to Northwest Water Corporation and hereinafter referred to as Northwest) was organized as a public utility under Colorado law on January 14, 1955. Its incorporators were Irving, Arthur and Shaw. The fourth article of incorporation provided that its total authorized capital stock was to consist of 150,000 shares of common stock without any nominal par value.

That same day, Northwest filed an application with the Colorado Public Utilities Commission (PUC) seeking a certificate of public convenience and necessity for the distribution and sale of water (suitable for domestic use) to certain residential subdivisions then being developed near Westminster, Colorado. A hearing was held on the application on February 7, 1955, but the application was not disposed of.

Following a special meeting of its stockholders, Northwest, on June 10, 1955, amended its fourth article of incorporation to provide:

FOURTH: This corporation is authorized to issue three classes of shares of stock to be designated as classes "A", "B", and "C" respectively; the total authorized capital stock of this corporation shall be 9,940 shares, of which amount 300 shares of the par value of $1.00 each, amounting to $300.00 shall be known as Class "A" stock; 8,700 shares of the par value of $1.00 each,

---

11. The appellants' argument in this respect seems to be a complete afterthought since they did not report even the 25% stock interest as capital gains on their income tax returns for the year in question.

amounting to $8,700.00 shall be known as Class "B" stock; and 940 shares of the par value of $150.00 each, amounting to $141,000.00 shall be known as Class "C" stock.

(a) Class "A" stock shall be entitled to dividends from the surplus net profits of the corporation as may be determined from time to time by the Board of Directors.

(b) Class "B" stock shall be entitled to make one connection or "tap" on the lines of the corporation for each share held.

(c) Holders of Class "C" stock shall be entitled to the first right to purchase any additional Class "B" stock which may hereafter be authorized, in a ratio to be determined by dividing the number of outstanding shares of Class "C" stock into the number of shares authorized. This paragraph is by way of an exception to the third paragraph of Article Fourth, and is to be construed strictly as an exception relating to Classes "B" and "C" stock only.

(d) The holders of Class "B" and "C" stock shall not, by reason of their holdings thereof, be entitled to vote at meetings of stockholders or to participate in any dividends declared from the profits of the corporation.

(e) In the event of any liquidation or dissolution or winding-up, (whether voluntary or involuntary) of the corporation, the holders of Class "B" and "C" stock shall be paid in full the par value of their shares, before any amount shall be paid to the holders of Class "A" stock; and after payment to the holders of Classes "B" and "C" of their par value, the remaining assets and funds shall be divided and paid to the holders of Class "A" stock according to their respective shares.

Northwest requested the PUC to issue an interim certificate on July 28, 1955. A hearing was held on September 2, 1955.[12] Thereafter, on September 28, 1955, the PUC denied Northwest's certificate request on the grounds its financial structure was unsound, unstable and contrary to public interest. On October 3, 1955, Northwest again amended its fourth article of incorporation and filed a copy of the amendment with the PUC.

On October 4, 1955, the PUC granted Northwest a certificate to supply water. It noted that the October 3 amendment to Northwest's articles of incorporation modified its capital structure so as to remove the previously objectionable features.

In its schedule of rates for water service, filed with the PUC on October 31, 1955, Northwest set forth the following recital:

2. *Water Main Extensions*

(a) *Free Extensions*

If a requested extension of the company's water system shall be necessary to serve an applicant or group of applicants, the company on written request for service by such applicant or applicants, shall make the necessary extension at its own expense, provided the length of the entire extension is not greater than that obtained by allowing 100 feet or $100.00 per customer, whichever is the lesser.

(b) *Extension Above Free Limit*

If the main extension required in order to furnish service is no longer than the free extension specified in (a) above, such extension will be made under the following conditions:

The customer shall advance the cost of the extension over and above the free extension. . . .

When Northwest was first formed, Builders "subscribed" for a large quantity of its preferred stock. Although the term "stock subscription" was used, it was not intended that Builders would actually acquire any stock or become a

---

**12.** Following the hearing Northwest, on September 15, 1955, again amended its fourth article of incorporation.

stockholder in Northwest. The purpose of the subscription was to provide Northwest with initial working capital. Accordingly, Builders did not require that shares of stock be issued to it.

When Builders entered into a contract to sell its land to contractors (apparently the same land for which Northwest obtained a certificate to provide water service), it required the prospective purchaser to simultaneously buy stock in Northwest, thus assuring sales of Northwest stock. Contractors paid funds to Northwest in the same manner as they would pay tap fees to a city or other water or sanitation district, and for the same purpose. Although Northwest's certificate obligated it to provide water service to anyone in its certificate area, Arthur would tell purchasers stock subscriptions were necessary to insure operating funds for water service.[13] The amount of stock required to be purchased was generally measured by the amount of land purchased. This money was used by Northwest for facilities such as pumps and storage tanks, but there was no specific allocation.

Builders, of course, was interested in arranging for the sale of all stock it had subscribed for and when a land purchaser agreed to buy stock Builders would direct that such shares be issued by Northwest to the purchaser directly. Builders, then, was never really a stockholder, although it had subscribed for stock, but was merely a conduit in the sale thereof.

Payments by land purchasers for stock were nonrefundable under any circumstances. Moreover, the stock purchaser had to agree to resell the stock to Northwest's promoters through Investment, at a nominal price. Stock was returned to Investment rather than Northwest because it was thought the PUC might "look askance" at the transactions.

Russel Daughenbaugh was the first land purchaser to buy Northwest stock. He purchased approximately 135 acres of land from Builders and also entered into a contract with Northwest to purchase 500 shares of Class "B" stock at $150 per share. The contract also provided that he would install laterals, meters, hydrants and other necessary water connections to Northwest's water main. These improvements were to be turned over to Northwest free and clear of all encumbrances in exchange for Class "C" stock.

Several months later, in February, 1956, Daughenbaugh agreed to sell his Northwest stock to Investment. The price to be paid was five cents for each share of Class "B" stock and twenty-five cents for each share of Class "C" stock.

On January 2, 1959, Daughenbaugh entered into a contract with Northwest for the purpose of modifying their earlier contract, so as to bring it in line with the proposed modification of Northwest's capital stock structure.[14] The contract provided that he would subscribe to 1700 shares of new common stock at $40 per share, or alternatively exchange each share of Class "B" stock for 5 shares of new common stock. Further, the new common stock, paid for by the installation of improvements, would be in lieu of the Class "C" stock. Daughenbaugh then agreed, by letter contract of the same date, to deliver to Investment such new shares of Northwest stock which might be issued to him pursuant to the modified agreement, for fifty cents per share.

In 1961, Daughenbaugh installed water mains, laterals and hydrants, which were to become part of Northwest's system. The aggregate cost of these improvements was $46,085.22. He advised Northwest of this in a sworn statement on December 15, 1961.

---

13. During the trial before the Tax Court, Arthur stated: "They [Northwest] were required to do it [provide water service]. But if they had no funds with which to do it, I believe the saying goes, 'sue me'."

14. Northwest's stock structure was changed on May 13, 1957, by again amending its fourth article of incorporation.

Daughenbaugh testified, at trial to the Tax Court, as to his understanding of his transactions with Northwest and Builders. He said the PUC would not allow him to purchase water taps and that to obtain water utility improvements he had to purchase stock in Northwest. He said the Northwest stock was not worth $150 per share to him but that it was a common practice in dealing with a water company to either pay a tap fee or install water lines and give them to the water company. He said that by purchasing Northwest stock, and transferring improvements to Northwest, he was acquiring and assuring water service for the houses he was building. To facilitate the charging of these costs as expenses against house construction, he arranged with Northwest to resell his stock.

The method previously described, where land purchasers bought and resold Northwest stock, was generally followed through 1961. On June 18, 1962, Winston Construction Company (Winston), owned by Shaw, purchased Builders land for $1,000,000. On the same day it purchased 500 shares of Northwest's stock, par value of $1 per share, for $250 per share. This purchase represented 9 to 10 percent of Northwest's total outstanding stock. The number of shares purchased was not measured by the amount of land purchased and there was no agreement to resell the stock. The stock subscription was intended by Winston to be a permanent investment. This transaction changed the proportionate ownership of Northwest.[15]

The IRS sent statutory notices of deficiencies to Northwest, pertaining to its 1955 through 1962 taxable years. It determined that money and property received by Northwest from Daughenbaugh was paid for water tap rights and constituted ordinary income; that amounts received by Northwest for its capital stock, in excess of its $1.00 per share par value, was paid for water tap rights and constituted ordinary income; and, that amounts received from Winston, for stock, was paid for water tap rights and constituted ordinary income.

At trial to the Tax Court the IRS asserted that building contractors were required to purchase Northwest stock in order to obtain water taps, and simultaneously resell the stock to Northwest's promoters at a nominal price. Contending the contractors actually were paying for water service, the IRS asserted such amounts received by Northwest constituted ordinary income, under 26 U.S.C. § 61.[16]

Northwest unsuccessfully contended the monies received constituted non-shareholder contributions to capital, under 26 U.S.C. § 118.[17]

The Tax Court sustained the IRS' determination, with the exception of the Winston transaction (not in issue here). On appeal, Northwest contends the Tax Court's decision is against the weight of authority.

An early line of cases, supportive of Northwest's contention, held contributions to public utilities in aid of the construction of the utilities of service lines or of spur tracks or like facilities to provide service to the contributor did not constitute taxable income to the recipient company.[18] These cases, however, were eroded by subsequent United States Supreme Court decisions which gradually but persistently broadened the concept of taxable income.[19]

15. Before this transaction, Arthur, Irving and Shaw, either directly or through Investment, each had a one-third equity ownership in Northwest. After the transaction, Shaw's interest increased to 40 percent.

16. 26 U.S.C. § 61 provides in part: "Except as otherwise provided in this subtitle, gross income means all income from whatever source derived . . .."

17. 26 U.S.C. § 118 provides, in part: "In the case of a corporation, gross income does not include any contribution to the capital of the taxpayer."

18. See Edwards v. Cuba R.R., 268 U.S. 628, 45 S.Ct. 614, 69 L.Ed. 1124 (1925), and cases cited in Rev.Rul. 58–555 and 7 Mertens, L.Fed. Income Tax. § 38.23 (Zimet & Barton rev. 1967).

19. See, e. g., CIR v. LoBue, 351 U.S. 243, 76 S.Ct. 800, 100 L.Ed. 1142 (1956); General Am. Investors Co. v. CIR, 348 U.S. 434, 75 S.Ct. 478, 99 L.Ed. 504 (1955); CIR v. Glen-

Two such decisions, Detroit Edison Co. v. CIR, 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286 (1943), and Brown Shoe Co. v. CIR, 339 U.S. 583, 70 S.Ct. 820, 94 L.Ed. 1081 (1950), made it clear that whether a payment to a corporation constituted taxable income or a nontaxable contribution to capital depends upon the motive or purpose and intent in making the payment. In *Detroit Edison* the Court held payments by farmers and other customers to a utility for an extension of its facilities were not contributions to the company, but "were to the customer the price of the service." In *Brown Shoe* the Court held cash and other property received from certain community groups as an inducement to the taxpayer to locate and expand its facilities in those communities were contributions. The Court stated:

> Because in the Detroit Edison case "The payments were to the customer the price of the service," the Court concluded that "it overtaxes [the] imagination to regard the farmers and other customers who furnished these funds as makers either of donations or contributions to the Company." Since in this case there are neither customers nor payments for service, we may infer a different purpose in the transactions . . .. The contributions to petitioner were provided by citizens of the respective communities who neither sought nor could have anticipated any direct service or recompense whatever, their only expectation being that such contributions might prove advantageous to the community at large.

Based on these cases courts consistently have held that "contributions" in exchange for services constitutes taxable income.[20]

One of the first cases to apply this rule was Teleservice Co. of Wyoming Val. v. CIR, 254 F.2d 105 (3rd Cir. 1958), cert. den'd, 357 U.S. 919, 78 S.Ct. 1360, 2 L.Ed.2d 1364, relied on by the Tax Court in the instant case. In *Teleservice*, a private corporation established a community antenna television system to provide television reception to residents of towns unable to receive adequate television signals. Consumers were required to pay an initial fee before they could hook up to the system, and thereafter paid a monthly charge. The court found the hookup fees were nonaltruistically motivated payments for services bearing no semblance to capital contributions, and held these payments constituted taxable income to the recipient company.

Northwest contends the Tax Court's reliance on *Teleservice* is misplaced because of Revenue Ruling 58–555, which stated the IRS was not abandoning the early line of cases but that it had litigated *Teleservice* because it was factually distinguishable. It stated several distinguishing characteristics, not all of which are present here. The basic distinguishing feature, however, was the nature of the payment in *Teleservice*. The Revenue Ruling states:

> In short, the amounts involved in *Teleservice Company* were advance payments made for service and not payments for investment in facilities to be operated for an indefinite period.
> . . .

Because the payments in the instant case, like the payments in *Teleservice*, were made for services, Revenue Ruling 58–555 is inapplicable here.[21]

▮ Although Northwest was obligated to provide water service to anyone in its certificated area, the extent of its

---

shaw Glass Co., 348 U.S. 426, 75 S.Ct. 473, 99 L.Ed. 483 (1955); Robertson v. United States, 343 U.S. 711, 72 S.Ct. 994, 96 L.Ed. 1237 (1952); Detroit Edison Co. v. CIR, 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286 (1943).

**20.** *See, e. g.,* Crystal Lake Cemetery Ass'n v. United States, 413 F.2d 617 (8th Cir. 1969); United Grocers Ltd. v. United States, 308 F.2d

634 (9th Cir. 1962); Teleservice Co. of Wyoming Val. v. CIR, 254 F.2d 105 (3rd Cir. 1958), cert. den'd, 357 U.S. 919, 78 S.Ct. 1360, 2 L.Ed.2d 1364; Community T. V. Ass'n v. United States, 203 F.Supp. 270 (D.Mont.1962).

**21.** For the same reason, Northwest's reliance on Revenue Ruling 66–353 is misplaced.

service was effectively controlled by Builders, which owned the land in that area and would not sell it unless the purchaser agreed to buy stock in Northwest. The purpose was to obtain operating funds for Northwest. Without such funds it could not provide water service, and, without water service, Builders' land would not be as saleable or as valuable. These stock purchases, therefore, were not made without any anticipation or expectation of direct service or recompense. Instead, they were required payments to obtain land and water service. As such, they constitute taxable income.

Additional factors indicate the payments in question were not contributions to capital. Northwest's tax returns for the years in question do not reflect the receipt of capital contributions by reducing the basis of acquired assets. 26 U.S.C. § 362. Payments were not refundable under any circumstance, even if the potential use of the land did not require water service. A stock purchaser was not free to do with his stock as he wished but was required to resell it to Investment.

Finally, although the PUC permitted Northwest to collect the expense it incurred in providing water extensions for customers (in excess of the free footage it was required to provide), there is no evidence in the record that the monies it received were requested or utilized in aid of construction. Instead, no specific allocation was made of these funds. These facts do not show funds were donated or contributed. Rather, they show a payment for services and therefore constitute taxable income to Northwest.

▮ The Tax Court also held Northwest realized ordinary income when it received equipment installed by Daughenbaugh. On appeal it is contended that this decision is erroneous because the amount was a contribution to capital and because the IRS failed to carry its

burden of proof.[22] The record does not support this contention.

This arrangement was virtually the same type of agreement as made by Northwest with other contractors, the only difference being that Daughenbaugh installed improvements instead of paying money (for stock) for water service. At trial to the Tax Court Daughenbaugh himself stated that he regarded the transfer of equipment as payment for water service. This is bolstered by the initial agreement Northwest and Daughenbaugh made which states that payment for the equipment was to be in returnable stock.

Northwest apparently attempted to change this arrangement after the IRS' initial investigation in 1961. In April, 1961, Northwest set up, in its books, an account payable to Daughenbaugh in the amount of $46,085.22. Its books further indicate this amount was cancelled on December 31, 1966, again established as a debt on January 1, 1967, and again cancelled later that same month. Elsewhere in Northwest's books an October, 1962, entry lists $46,085.22 (at 6% interest) payable to Daughenbaugh for the "purchase" on May 5, 1962 of water lines and other equipment. The Tax Court found and the record indicates that this series of entries reflects a lack of economic reality to the transaction. In short, the record shows the IRS carried its burden of proof in establishing that the equipment was transferred in return for water service, and was not a contribution to capital.

Finally, the Tax Court held certain gains and losses reported by Builders were not includable in its gross income. Builders' ledger account, which reflected payments made to Northwest, was entitled "Investment—400 shares stock Northwest Water Co.—400 prepaid taps." This account indicates that between March 29, 1955, and July 9, 1955, Builders advanced $73,500 to Northwest for stock subscriptions.[23]

22. The IRS raised this issue in its amended pleadings, and bore the burden of proof. *See* 9 Mertens, L.Fed. Income Tax. § 50.43 (Zimet rev.1971).

23. Builders' balance sheets on February 29, 1956, February 28, 1957, and February 28, 1959, reflect, under the heading "Other Assets", respective amounts of $73,500, $69,000 and $66,000 (declining balance).

In its taxable years ending February 28, 1959 and February 28, 1960, Builders received from stock purchasers more money than it had advanced to Northwest under its subscription. Accordingly, it reported, on its federal income tax returns, gains from sale of stock of $5,040 and $1,320, respectively. During its taxable year ending February 28, 1961, Builders received less money from stock purchasers than it had advanced to Northwest. Accordingly, it reported a loss of $11,985.26 from sale of stock on its federal income tax returns for that year.

The IRS sent a statutory notice of deficiency to Builders, stating the gains reported by it were not includable in its gross income because it sold the stock as Northwest's agent. The loss was disallowed for the same reason.

 During trial to the Tax Court the IRS contended Builders was merely a conduit for the sale of Northwest's stock and could therefore sustain no gain or loss upon the sale of stock. It contended any such gain or loss should be reported by Northwest. It was conceded that Builders was Northwest's agent, but asserted, with little elaboration, that it could nonetheless sustain a gain or loss. The Tax Court upheld the IRS' determination. On appeal, it is again asserted that Builders could sustain a gain or loss, because it was not acting as an agent or broker for Northwest.

Appellants offer little support for their argument. The record indicates the transactions were a loan arrangement and not an agency or brokerage arrangement. There is no evidence of a commission arrangement. The record shows Builders loaned money to Northwest which was to be repaid with funds received from sale of stock. Builders was merely reimbursing itself for loans made, and did not receive it as compensation for the sale of stock. It cannot

therefore have a gain or loss from sale of stock. The Tax Court's decision is affirmed as to this issue.

## VI. TRUSTS

On December 15, 1952, Arthur established the Sylvia C. Hayutin Trust for his wife, and the Marjorie Ellen Hayutin Trust and Robyn Dee Hayutin Trust for his children. Two days later Irving established the Sima B. Hayutin Trust for his wife, and the Adele Hayutin Trust, Diane Hayutin Trust, Marc Ivan Hayutin Trust, and Randy Hayutin Trust for his children. Arthur was named trustee for the trusts established by Irving, and Irving was named trustee for the trusts established by Arthur.

Each of the trusts provided: (1) the first $100 of net income was to be accumulated and made part of the trust corpus; (2) where annual income exceeded $100, but was less than $520, such excess was to be paid in semi-annual installments; (3) net income exceeding $520 was to be accumulated by the trustee and added to the trust corpus; [24] (4) the trustee was empowered to use both income and principal for preservation of beneficiaries' health or for educational purposes.

Each instrument contained two additional clauses:

The Trustee shall have full, complete and absolute discretion to invest, reinvest, buy and sell real and personal property, manage and control the moneys and property of which he may, as Trustee, become from time to time possessed. He may lend money either with or without security, and at such rate of interest as he may in his sole discretion, determine. He shall have the duty, if the Donor shall so request, to lend money from this trust fund to the Donor but in such event the rate of interest charged shall not be less than 3½ per cent per annum, and shall

---

24. Two of the eight trusts contained somewhat different provisions. In the Sima B. Hayutin Trust, net income exceeding $100, but less than $4,900 was to be paid to the beneficiary with any excess accumulated and made part of the trust corpus. In the Sylvia C. Hayutin Trust, annual income over $100, but less than $4,300, was to be paid to the beneficiary with any excess to be accumulated and made part of the trust corpus.

be payable not less often than annually.

. . . . .

[I]n the event that in the judgment of the Trustee it shall become necessary or advisable for the protection or preservation of the Donor's estate, the Trustee is expressly authorized to purchase from the legal representative of such estate any property or securities comprising a portion thereof, and to make secured or unsecured loans to such legal representatives, and the Trustee shall incur no liability for loss resulting from any such purchase or loan.

Books of account and records of the eight trusts were kept by Arthur under his supervision. Originally, there were separate fiduciary bank accounts for each trust. Later, however, only two accounts were kept, one fiduciary account for Arthur's trusts and one for Irving's. Subsidiary ledgers for each of the trusts were kept.

On January 6, 1953, Arthur and Irving executed a joint document entitled "Agreement And Declaration Of Trust", which purported to convey to the previously established trusts a portion of the undivided ⅓ interest Arthur and Irving each held in the Barnes-Shaw tract of land. The agreement stated in part:

Therefore in consideration of the mutual covenants herein contained Arthur B. Hayutin agrees to hold as trustee in existing trusts . . . shares of the entire tract . . . to be taken from his present holding of an undivided one-third.

. . . . .

Irving J. Hayutin agrees to hold as trustee in existing trusts . . . shares of the entire tract . . . to be taken from his present holding of an undivided one-third.

The agreement also provided:

The parties hereto, as trustees, are authorized to trade, sell or encumber, the property in any manner whatsoever, without consent from the beneficiaries or their legal representatives and to act for said beneficiaries in their place and stead, as fully as if they themselves were to act, and such power shall continue as long as the record title to the above described property or any portion thereof shall remain in the names of Irving J. Hayutin, Arthur B. Hayutin and Gene E. Shaw.

No gift tax was paid with respect to these transfers in trust and no deeds evidencing the land transfers were executed or conveyed to the trustees.

Thereafter, several loans were made by the trusts, all of which were interest bearing, reflected by notes, and repaid. One Fieman, who went to law school with Arthur, borrowed from the trusts in 1956 and repaid the loan in 1957. Matthew Raia borrowed $175 in 1956 and $150 in 1957. Although Raia executed a note, no other security was given for the loans. They were repaid in 1958. Northwest borrowed $1,200 from the trusts in 1957 and repaid the loan in 1959. In 1959, Arthur, as trustee for the Marc Ivan, Adele, Randy and Diane Hayutin trusts, loaned $750 from each of them to the Hayutin & Hayutin law partnership to improve a building owned by the partnership. No security was given for these loans. Jean Kintz, an employee of related entities, and her husband borrowed $1,000 from the trusts in 1960. Other similar loans were made.

Subsequently, the IRS sent statutory notices of deficiencies to Arthur and Irving, and their wives. It determined amounts paid to the trusts were not payments to the trusts but were actually income to Arthur and Irving. Corresponding adjustments were made to eliminate from gross income amounts reported as income from the trusts by the wife-beneficiaries.

At trial to the Tax Court, appellants contended the transfers were valid conveyances, and alternatively contended they operated as present conveyances. The Tax Court determined that Colorado law requires irrevocable delivery of a

deed to vest legal title in the trustee,[25] and found this requirement had not been met because no deed was delivered to the trustees, and because the Agreement And Declaration Of Trust expressly stated that appellants were retaining title to the land. Applying the general rule that a transfer may be ineffective for lack of formalities to vest title in the transferee, 1 Scott, The Law of Trusts 266 (3rd ed. 1967), the Tax Court held the transfers invalid. It also held that appellants had failed to adequately support their present conveyance theory.

Appellants contend the Tax Court's decision is erroneous. That decision, however, is a finding of fact which must be sustained if supported by the record. Oklahoma Press Pub. Co. v. United States, 437 F.2d 1275 (10th Cir. 1971). Accordingly, the evidence must be viewed in the light most favorable to the party prevailing below, the government.

Appellants acknowledge the validity of the general rule applied by the Tax Court, that lack of formalities may invalidate a transfer, but assert the rule is inapplicable here because it affects only gratuitous transfers. The Agreement And Declaration Of Trust, they argue, is a valid contract to convey which is supported by consideration (the mutual promises of Arthur and Irving to act as trustee for the other). The applicable rule for this situation, found in 1 Scott, Law of Trusts 270 (3rd ed. 1967), is said to be:

> Where consideration is paid for a conveyance in trust, and the conveyance is ineffective to transfer the title to the property to the trustee, a court of equity will compel the transferor to complete the conveyance. . . .

The rule cited by appellants is applicable where there has been a legitimate, but nonetheless ineffective, attempt to convey property in trust. The evidence in the instant case, when viewed in the light most favorable to the government, does not disclose such an attempt. Although appellants initially contended there was a valid transfer in trust, no gift tax was paid. No deed was registered; in fact, no deed was ever conveyed. The instrument in question contains no words of operative conveyance. Instead, it states that appellants are retaining title to the purportedly transferred land.

The circumstances do not establish an attempted transfer, and do not merit application of the rule proffered by appellants. The Tax Court's decision is affirmed as to this issue.

## VII. DUE PROCESS

These cases involve tax liabilities for transactions dating back to 1953. The IRS did not begin auditing any of the parties' transactions until 1957, and the trial to the Tax Court did not commence until 1968. The Tax Court's opinion was not issued until June 12, 1972, and the decisions were not entered until June 22, 1973.

Appellants contend that because of this delay (1) records have become difficult to obtain; (2) witnesses' memories have dimmed; (3) Shaw, an important witness, is now dead; (4) the Tax Court's opinion, which was issued $4\frac{1}{2}$ years after the trial, cannot, because of that period of time, accurately reflect witnesses' credibility; (5) their businesses have been forced to remain in a state of flux; and (6) appellants have been hampered in their attempt to seek justice by the procedural rule which impos-

---

**25.** This determination, which appellants do not contest on appeal, is based on Bank of America Nat'l Trust & Sav. Ass'n v. Scully, 92 F.2d 97 (10th Cir. 1937), where this Court stated: "An essential of an express trust is a trust res, the legal title to which is vested in the trustee", and Richard v. James, 133 Colo. 180, 292 P.2d 977 (1956), where the Colorado Supreme Court stated: "It is not essential to the validity of a trust that all proceeds of the property conveyed be immediately devoted to the benefit of the trust. * * * It is not delivery of possession of the property, but irrevocable delivery of possession of the deed which is the primary consideration."

es on them the burden of overcoming the presumed correctness of the Tax Court's decision.

Based on these reasons they assert they have been denied due process of law. A search of the record discloses that this issue was not raised at trial to the Tax Court. It is therefore inappropriate for appellate consideration. *See, e. g.,* CIR v. Finley, 265 F.2d 885 (10th Cir. 1959), cert. den'd, 361 U.S. 834, 80 S.Ct. 87, 4 L.Ed.2d 76; Hotel Kingkade v. CIR, 180 F.2d 310 (10th Cir. 1950).

The decision of the Tax Court is affirmed in all respects.