JULIUS E. HOEME and NORMA R. HOEME, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent RONALD O. STONESTREET, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hoeme v. Commissioner
Docket Nos. 110-74, 2737-74.
United States Tax Court
T.C. Memo 1977-211; 1977 Tax Ct. Memo LEXIS 232; 36 T.C.M. (CCH) 880; T.C.M. (RIA) 770211; July 11, 1977, Filed *232 Held, payments which petitioner Stonestreet made to petitioner Norma R. Hoeme, his ex-wife, in 1970 and in 1971 were made because of the family or marital relationship in recognition of the general obligation to support. Philip J. Erbacher, for the petitioners in docket No. 110-74. Stanley G. Andell and Richard D. Ewy, for the petitioner in docket No. 2737-74. Edward G. Lavery, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in petitioners' income taxes: [1]
1970
1971
Julius E. Hoeme
$541.79
$547.89
and Norma R. Hoeme
Ronald O. Stonestreet
616.28
688.60
*234 The sole issue is whether certain payments made by Ronald O. Stonestreet (hereinafter Stonestreet) to his ex-wife were for support. If they were, then Stonestreet may deduct them, pursuant to section 215, [2] and Hoeme must include them in income, pursuant to section 71. FINDINGS OF FACT Some of the facts were stipulated and are found accordingly. Norma R. Hoeme and her husband, Julius, lived in Wichita, Kansas, when they timely filed their 1970 and 1971 income tax returns, and in Kansas City, Missouri, when they filed their petition in this case. Ronald O. Stonestreet lived in Pratt, Kansas, when he timely filed his 1970 and 1971 income tax returns, and in Wichita, Kansas, when he filed his petition in this case. On June 20, 1948, Hoeme married Stonestreet. During their marriage Stonestreet supported his wife principally by farming, first in partnership with his father, Dale Stonestreet, and later in partnership with his brother, Arlie Stonestreet.The family lived on the farm. Hoeme kept the house and worked on the farm during the busy seasons. She had no outside source of income. *235 Stonestreet and his wife had three children. In January of 1968, Hoeme and Stonestreet separated, and Hoeme filed for divorce in the district court of Pratt County, Kansas. Paul R. Wunsch represented Hoeme, and Alfred Williams and John H. Shaffer represented Stonestreet in the divorce. Hoeme served interrogatories on Stonestreet who answered them on or about March 11, 1969. Stonestreet indicated in these answers that he owned a one-third remainder interest in 720 acres of Kansas land which he inherited from his father. The real estate was valued in the answers at $84,000, and the remainder interest was subject to a life estate in Stonestreet's mother, then about 60 years old. Paul Wunsch subsequently questioned the appraised value of this real estate, but insofar as the record discloses, he never obtained any evidence that the stated values were too low. Stonestreet also indicated in his answers that he owned the following cars, life insurance policies, and funds in bank accounts: 1. A 1965 automobile worth $1,300 owned jointly with his wife; 2. A 1968 automobile worth $3,000, encumbered by a loan of $3,413, owned individually; 3. A 1964 automobile worth $1,000, *236 for which he owed his son $1,000, owned individually but titled in his daughter's name; 4. Five life insurance policies with no cash surrender value because $2,623 had been borrowed against them; 5. Funds in two bank accounts with a combined balance of $136.37 on January 1, 1969. Stonestreet was an equal partner with his brother, Arlie, in a farming partnership, Stonestreet Farms; the value of the partnership equipment shown in the answers was $61,800. Hoeme got two independent appraisals of the partnership equipment in April and May of 1969. The appraisers valued the farming equipment at $63,325 and $69,331, respectively. The book value of the equipment indicated by the partnership's 1968 income tax return was $72,842.05. [3]
Using the book value of the equipment, Stonestreet's capital account in the partnership, as of December 31, 1968, was computed *237 on the partnership return as having a negative balance of $7,467.35. In his answers, Stonestreet indicated that the partnership indebtedness was $103,160 and that he personally owed $5,000 on a bank loan. Both the partnership return and the answers to interrogatories indicated that the partnership had no harvested crops on hand. However, of the approximately 3,800 acres farmed in 1969 by Stonestreet Farms, the answers to interrogatories indicated that 1,810 were already planted with wheat as of early March 1969. In May of 1969, John Shaffer computed Stonestreet's net worth at less than $1,000, and so informed Paul Wunsch. While the divorce was pending, Stonestreet made support payments to Hoeme of $200 per month in addition to the amounts he paid for his children's support. The attorneys for both Stonestreet and Hoeme conducted extensive negotiations as to the amount of money and other property that Hoeme and the children should receive from Stonestreet. The parties agreed from the beginning that Hoeme should receive the 1965 automobile together with the furniture, fixtures, and personal effects in her possession and that Stonestreet should retain the 1968 automobile, *238 the personal effects in his possession, and his interest in the Stonestreet Farms partnership. The negotiations concerned, for the most part, the interest, if any, that Hoeme should receive in the real estate and the amount and timing of cash payments. John Shaffer, in a letter to Paul Wunsch dated August 12, 1969, stated the following: If the offer is acceptable, Ron would appreciate your consulting with Mrs. Stonestreet about the effect of her re-marriage without a prenuptial agreement insofar as these benefits and the children are concerned. Mr. Stonestreet would like to see the benefits inure to the benefit of the children if anything would happen to Mrs. Stonestreet. The negotiations finally resulted on August 21, 1969, in the execution of a written agreement entitled "Property Settlement Agreement." In addition to providing for the children, it contained the following provisions: PROPERTYSETTLEMENTAGREEMENT
(c) The parties have orally agreed upon a property settlement which they desire to reduce to writing, wherein they agree upon the disposition of all property rights between them, claims for support, stipulation for attorneys' fees, costs and all *239 other matters incident to such separation; and (d) Each of the respective parties to this agreement is fully and completely informed of the financial and personal status of the other, and each of the parties has consulted with her and his respective attorneys and has given full and complete thought to the making of this agreement and the obligations contained herein; and each of the parties understands that the agreements assumed by the other are assumed with the express understanding and agreement that they are in full satisfaction of all obligations which each of said parties now has or might hereafter or otherwise have towards the other. NOW, THEREFORE, in consideration of the premises and the mutual agreements and undertakings hereinafter contained, it is agreed by and between the parties as follows: (1) The Wife shall request the Court to grant her an absolute divorce from the Husband and shall ask the Court for approval of this agreement, as soon as practicable after the execution hereof. * * *
(5) Jeri Diane Stonestreet shall have and retain the 1964 Impala Chevrolet automobile now in her possession, free and clear of any and all claims of these parties. (6) *240 The parties hereto have acquired certain property and interests therein other than as a result of the marriage relationship and have also acquired certain property following their marriage, and it is mutually agreed that said property, and the interests therein, shall be divided and assigned as follows: A. TO THE WIFE: (a) The 1965 Delta 88 tudor Oldsmobile now in her possession; (b) The household furniture, appliances, and effects now in the possession of the Wife in Pratt, Kansas, with the EXCEPTION of any of the Husband's personal effects now located in the home; (c) Her bank account, savings account, clothing and personal effects; (d) The sum of $25,000.00, without interest, to be paid in the following manner: $2,500.00 cash to be paid forthwith; $200.00 per month for thirty months, commencing September 1, 1969; $150.00 per month at the conclusion of the thirty months aforementioned until the balance due and owing is paid in full; said unpaid balance to be secured by a lien against so much of the real estate owned by the Husband (or in which he has an interest), as will protect the unpaid balance; it being specifically understood and agreed that should Husband *241 fail to make any of the aforesaid payments and be in default for thirty days after any such payment is due, the entire unpaid balance shall then and in that event become due and owing and shall bear interest on such unpaid balance at the rate of 6% per annum until said amount is paid in full; and it is further understood and agreed by and between the parties that the Husband shall have the right and privilege of pre-payment of all or any part of the unpaid balance due and owing the Wife at any time. (e) The Husband shall pay to the Wife the further sum of $1,000.00 forthwith, which sum shall be paid on the liabilities incurred by these parties and existing at the time of the execution of this agreement, it being specifically understood and agreed that the Wife shall be responsible for and pay any and all such obligations remaining unpaid or partially unpaid after application of the aforesaid $1,000.00, holding the Husband harmless from any such unpaid or partially unpaid obligations. (f) With respect to oil and gas development and production, subject to the conditions and limitations expressly stated herein, the Wife shall have and receive an undivided one-half (1/2) interest *242 in and to the right, title, and interest of the Husband in and to all oil and gas royalties provided in and to be paid or delivered to the Husband under any oil and gas lease now or hereafter upon the following described real estate, to-wit: Southeast Quarter 2-25-15, Pratt County, Kansas; Northeast Quarter 11-28-15, Pratt County, Kansas; Southeast Quarter 9-28-34, Haskell County, Kansas; North Half Northwest Quarter 10-28-34, Haskell County, Kansas; and Southeast Quarter 10-28-34, Haskell County, Kansas, during the term of ten (10) years from the date of this agreement, and as long thereafter as oil and gas is produced, but the Wife shall not receive or have the right to receive any part of the bonuses or consideration for oil and gas leases, or rentals or delay money for postponement of development under oil and gas leases, which bonuses, consideration and delay rentals are to be paid to the Husband, who shall have the sole and exclusive right and to lease said described land or any part thereof for oil and gas to execute and deliver valid oil and gas leases upon said land and all oil and gas thereunder without the signature or consent of the Wife in the same manner and *243 to the same extent and with the same effect in all respects as if said Husband were the owner of full title to all of the oil and gas in and under, and that may be produced from said real estate. B.TO THE HUSBAND. (a) All of the Wife's right, title and interest in and to the following described parcels of real estate: Southeast Quarter, Section 2-28-15, Pratt County, Kansas; Northeast Quarter, Section 11-28-15, Pratt County, Kansas; Southeast Quarter, Section 9-28-34, Haskell County, Kansas; North Half of Northwest Quarter, Section 10-28-34, Haskell County, Kansas; and Southeast Quarter, Section 10-28-34, Haskell County, Kansas. (Husband is the owner of an undivided one-third (1/3) remainder interest in and to the foregoing described real estate.) (b) All of his right, title and interest in and to Stonestreet Farms, a partnership, including any and all real estate or interests therein, all vehicles, farm machinery, irrigation equipment and other personal property belonging to said partnership, and also including all grain, growing crops and government payments relating to any and all real estate or interests therein of the Husband, subject to any encumbrances thereon. *244 (c) The 1968 Delta 88 tudor Oldsmobile automobile now in the Husband's possession, subject to the encumbrance thereon. (d) All insurance policies now owned by the Husband, together with any cash values therein, subject to any loans thereon. (e) His checking and savings accounts, clothing and personal effects. (f) Any and all other property, both real and personal, not heretofore set over to the Wife. (7) The Husband agrees to pay the Wife's attorney's fees, the court costs incurred in the divorce action, and his attorneys' fees. (8) The Wife hereby stipulates and agrees that she disclaims any and all right, title and interest in and to the personal property or real estate set over to the Husband; and the Husband hereby agrees that he disclaims any and all right, title and interest to the personal property set over to the Wife, all as outlined and set forth herein. (9) It is mutually agreed that the parties hereto will execute any deeds, titles, assignments, transfers or other documents necessary to completely carry out the transfer of the property to each as set out herein. (10) It is further agreed that this agreement is intended as a fair, just and equitable *245 settlement as to the property rights of each of the parties hereto and shall constitute a complete and final settlement of all obligations, rights, claims and duties of every kind and nature arising out of their marriage relation; shall constitute and be a full and complete settlement as to all claims for all rights to alimony, support money, property division, attorneys' fees and costs; and that neither of the parties hereto may assert and further rights or claims against one another for the property owned by either of them, other than as set forth particularly herein, and all after acquired property shall be owned separately and individually by each of the parties hereto. (11) The parties agree to request the Court to approve the terms of this agreement as a part of its judgment and agree that the terms and provisions of this agreement may be incorporated in any decree of divorce hereafter obtained by either party; and it is further agreed that when approved by the Court, the terms and provisions hereof shall be binding upon and inure to the benefit of the respective parties and their respective heirs, legatees, devisees, personal representatives, successors or assigns; and to *246 the full performance of all the foregoing agreements, convenants and stipulations, the parties hereto respectively bind themselves, their heirs, executors, administrators, personal representatives and assigns. IN TESTIMONY WHEREOF the parties have hereunto set their hands and subscribed their names this 21st day of August, 1969. The attorneys' fees mentioned in paragraph 7 of the agreement had previously been estimated to be about $5,000. Both petitioners and John Shaffer were sensitive to the tax consequences resulting from the difference between support and a property settlement. Both petitioners wanted to avoid tax liability and have the other party assume it. The agreement was specifically drafted to leave the nature of the payments (as support or a property settlement) unclear. On August 22, 1969, the written agreement was incorporated into an uncontested decree of divorce entered by the district court of Pratt County, Kansas. The court ordered that "the defendant should make all payments as herein awarded to the plaintiff as property settlement." While the divorce was pending, Hoeme worked in the office of the city clerk of Pratt, Kansas. She started at a monthly *247 gross salary of $325 and by the time of her divorce was earning a monthly gross salary of $385. However, by the time the agreement was being finalized, she decided to quit her job and move to California. She did not know whether she would find employment there. Stonestreet paid Hoeme $2,400 in 1970 and again in 1971, pursuant to the terms of the written agreement and the bill of divorce. Hoeme remarried in 1970. The parties have stipulated that in the divorce proceedings, any rights of Hoeme or Stonestreet to the properties of each other were governed by Kansas law. ULTIMATE FINDING OF FACT Stonestreet made payments to Hoeme in 1970 and 1971 because of the family or marital relationship in recognition of the general obligation to support. OPINION In January of 1968, Hoeme sued Stonestreet for divorce. On August 21, 1969, they entered into a written settlement of their claims against each other, and on August 22, 1969, Hoeme obtained an uncontested divorce. Pursuant to the settlement, Stonestreet agreed to pay Hoeme $2,500 immediately, $200 per month from September 1969 through February 1972, and $150 per month from March 1972 through April 1981. Accordingly, he *248 paid her $2,400 in 1970 and again in 1971. Since the payments extend over more than 10 years, they are to be treated as "periodic payments" under section 71(c)(2). Hoeme v. Commissioner,63 T.C. 18, 19 (1974). Although the payments are to be treated as "periodic payments," Hoeme argues that they are not includable in her income pursuant to section 71(a)(1). [4] She apparently concedes that the conditions of that section are met with one exception. That contested condition is explained in section 1.71-1(b)(4), Income Tax Regs., as follows: Section 71(a) applies only to payments made because of the family or marital relationship in recognition of the general obligation to support which is made specific by the decree, instrument or agreement. *249 Hoeme argues that the payments constitute a property settlement rather than alimony or support. If she is right, then she need not include the payments in income pursuant to section 71, and Stonestreet may not deduct them pursuant to section 215. [5] If she is wrong, then she must include them in income, and her former husband may deduct them. Sections 71 and 215 were enacted to provide uniformity of treatment for amounts paid as support, regardless of variances in state law. H. Rept. No. 2333, 77th Cong., 2d Sess. (1942), 1942-2 C.B. 427; S. Rept. No. 1631, 77th Cong., 2d Sess. (1942), 1942-2 C.B. 568; Bardwell v. Commissioner,318 F. 2d 786, 789 (10th Cir. 1963), *250 affg. 38 T.C. 84 (1962). Whether given payments represent support does not depend upon any labels that may be placed upon the payments by the parties or state law. Bardwell,supra at 789; Hayutin v. Commissioner,508 F. 2d 462 (10th Cir. 1974), affg. a Memorandum Opinion of this Court. Although we are not bound by the labels placed upon the payments by the parties in the settlement agreement, this is, nevertheless, an obvious place to begin looking to decide the issue at hand. Unfortunately, the settlement agreement is hopelessly inconclusive and ambiguous on its face. It is entitled "Property Settlement Agreement" which supports Hoeme's position. Yet introductory paragraph (c) states the following: (c) The parties have orally agreed upon a property settlement which they desire to reduce to writing, wherein they agree upon the disposition of all property rights between them, claims for support, stipulation for attorneys' fees, costs and all other matters incident to such separation; * * * [Emphasis added.] In addition, paragraph (10) states the following: (10) It is further agreed that this agreement is intended *251 as a fair, just and equitable settlement as to the property rights of each of the parties hereto and shall constitute a complete and final settlement of all obligations, rights, claims and duties of every kind and nature arising out of their marriage relation; shall constitute and be a full and completesettlement as to all claims for all rights toalimony, support money, property division, attorneys' fees and costs; * * * [Emphasis added.] The agreement is inconclusive because that was the way it was drafted. Both petitioners and John H. Shaffer, who represented Stonestreet in his divorce, testified that they were sensitive to the tax consequences resulting from the difference between alimony and a property settlement. Petitioners failed to settle the nature of the payments because each wanted to avoid tax liability and have the other party assume it. There was no meeting of the minds. This was perhaps unwise because the parties are now presumably incurring additional legal fees to have the question decided by this Court. In any event, the parties are before us, and therefore we will resolve the question. Since the agreement itself is inconclusive, we must *252 look to other facts and circumstances surrounding the agreement. Hayutin,supra at 468. After a careful consideration of the entire record, we conclude that the 1970 and 1971 payments constitute support. Stonestreet paid Hoeme $200 a month for her support while the divorce was pending in addition to the amounts he paid for his children's support. This is evidence that the payments after the divorce (also $200 a month during the years in question) were a continuation of the support payments made before the divorce. Landa v. Commissioner,211 F. 2d 46 (D.C. Cir. 1954). Furthermore,e, Stonestreet's net worth was apparently quite low at the time of the divorce.He had debts, his capital account in Stonestreet Farms showed a negative balance, and that partnership itself had many debts. Obviously, for "the payments at issue to have been in discharge of a division of property, it must be demonstrated that [the ex-wife] had an interest in property which she was relinquishing and for which the [payments in issue were] compensation." Hesse v. Commissioner,60 T.C. 685, 692 (1973), affd. 511 F. 2d 1393 (3d Cir. 1975), *253 cert. denied 423 U.S. 834 (1975). Such property as Stonestreet had he shared with his wife. She received a car, the household furniture and appliances, and an interest in certain oil and gas royalties. Unfortunately we have not been able to make a precise determination of Stonestreet's net worth; the record simply will not allow this. We do note, however, that John Shaffer, Stonestreet's attorney for the divorce, estimated his net worth at less than $1,000. Respondent on brief calculates it at around $4,000. There is certainly not sufficient evidence in the record to calculate Stonestreet's net worth at anywhere near the $25,000 that Hoeme was to receive over the years. Hoeme offers little relevant factual evidence to support her position. She notes that the agreement is called a "Property Settlement Agreement" and that the decree of divorce referred to the payments in question as "property settlement." As noted above, however, the labels attached to these payments are not controlling. Bardwell,supra.Furthermore, Hoeme emphasizes that the payments were to continue although she might remarry or die. This is true, but it is not sufficient *254 proof to have us conclude that the payments constitute a property settlement. In our judgment, for the reasons indicated above, the weight of the evidence indicates that these payments constitute support. Finally, Hoeme points to a paragraph in a letter of John Shaffer to Paul Wunsch, Hoeme's attorney, dated August 12, 1969: If the offer [proposed in the letter] is acceptable, [Stonestreet] would appreciate your consulting with [Hoeme] about the effect of her re-marriage withou a prenuptial agreement insofar as these benefits and the children are concerned. Mr. Stonestreet would like to see the benefits inure to the benefit of the children if anything would happen to [Hoeme]. This paragraph adds little to Hoeme's argument. As just stated these payments admittedly continue although Hoeme might remarry or die; this is not, however, sufficient evidence to make them part of a property settlement. Since Stonestreet agreed that the payments were to continue, it is perfectly understandable that he would want the payments to inure to the benefit of his children in event of his wife's death rather than have the payments inure to the benefit of someone else (perhaps her second *255 husband). Hoeme also makes two legal arguments which we must reject. The first centers upon Hoeme's remarriage in 1970. She cites Hoffman v. Commissioner,54 T.C. 1607 (1970), affd. 455 F. 2d 161 (7th Cir. 1972), as dispositive of the issue before us. Hoffman involved Illinois law. In Illinois, the termination of alimony upon remarriage of the wife is mandatory and operates automatically as a matter of law. We held that the payments in question were not made in discharge of a "legal obligation" within the meaning of section 71(a)(1) and therefore were not taxable to the ex-wife. Clearly Hoffman is distinguishable.In this case we are dealing with Kansas law. The Kansas Supreme Court held in Herzmark v. Herzmark,199 Kan. 48, 427 P. 2d 465, 470 (1967), that it was not the intention of the legislature to have alimony payments automatically terminate upon remarriage of the re-cipient. Rather, proof of remarriage makes a prima facie case for termination. There is no evidence that any Kansas court has ordered the termination of the payments involved herein. Accordingly, Hoffman is distinguishable, and petitioner's argument *256 must fail.
In her second legal argument, petitioner concludes that Kansas ia a "quasi-community property state." The argument which leads to this conclusion is very involved; we need not repeat it here for it has already been rejected in a motion for summary judgment. Hoeme v. Commissioner,63 T.C. 18 (1974). See also United States v. Mills,372 F. 2d 693 (10th Cir. 1966). We have considered the other arguments in petitioner's voluminous briefs and find them without merit. Decision will be entered in docket No. 110-74 for respondent. Decision will be entered in docket No. 2737-74 under Rule 155. Footnotes
1. Julius E. Hoeme is a petitioner herein solely because he filed a joint return with his wife, Norma R. Hoeme. Hereinafter "Hoeme" will refer to her alone.↩
2. Statutory references are to the Internal Revenue Code of 1954, as amended.↩
3. The book value does not include the value of a house trailer purchased in January of 1969. Since Hoeme's independent appraisals were made in April and May of 1969, these appraisals include the value of that trailer. Both appraisers valued it at $6,000. The answers to interrogatories valued the trailer at $5,500.↩
4. SEC. 71. ALIMONY AND SEPARATE MAINTENANCE PAYMENTS. (a) General Rule.-- (1) Decree of divorce or separate maintenance.--If a wife is divorced or legally separated from her husband under a decree of divorce or of separate maintenance, the wife's gross income includes periodic payments (whether or not made at regular intervals) received after such decree in discharge of (or attributable to property transferred, in trust or otherwise, in discharge of) a legal obligation which, because of the marital or family relationship, is imposed on or incurred by the husband under the decree or under a written instrument incident to such divorce or separation.↩
5. SEC. 215. ALIMONY, ETC., PAYMENTS. (a) General Rule.--In the case of a husband described in section 71, there shall be allowed as a deduction amounts includable under section 71 in the gross income of his wife, payment of which is made within the husband's taxable year. No deduction shall be allowed under the preceding sentence with respect to any payment if, by reason of section 71(d) or 682, the amount thereof is not includable in the husband's gross income.↩