LEE B. FARKAS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Farkas v. Commissioner
Docket No. 27093-83.
United States Tax Court
T.C. Memo 1985-488; 1985 Tax Ct. Memo LEXIS 145; 50 T.C.M. (CCH) 1085; T.C.M. (RIA) 85488; September 18, 1985. Patricia Tucker, for the petitioner. Marty J. Raisanen, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in Federal income tax against petitioner as follows: Taxable year ended
Deficiency
December 31, 1979
$5,920
December 31, 1980
273
$6,193
The parties have stipulated to be bound by this Court's final decision in Casey v. Commissioner,T.C. Memo. 1985-472, with respect to respondent's adjustments relating to a sales tax deduction, in the amount *146 of $3,973, claimed by petitioner, for the taxable year 1979, in connection with his purchase of a newly constructed residence. After the above stipulation, and further concessions by petitioner, the issues for decision are: (1) Whether petitioner is entitled to a bad debt deduction in the amount of $9,975.72, for the taxable year 1979, or alternatively, for 1980; and (2) whether petitioner is entitled to a deduction, in the amount of $154, for legal fees, for the year 1979. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, and exhibits attached thereto are incorporated herein by this reference. Lee B. Farkas (hereinafter "petitioner") was a resident of Albuquerque, New Mexico, at the time of filing the petition herein. Petitioner filed income tax returns for the calendar years 1979 and 1980 with the Internal Revenue Service Center at Austin, Texas. Professional Leasing, Inc. (hereinafter "Professional") was a New Mexico corporation formed in 1978. Professional was formed by Edward Yudin (hereinafter "Yudin"), a local attorney, at the request of Bernard Mazel (hereinafter "Mazel") and petitioner, *147 for the purpose of leasing luxury automobiles in Albuquerque, New Mexico. Prior to the formation of Professional, Mazel and petitioner had discussed the possibility of petitioner's acquisition of an equity interest in the corporation. An oral agreement was reached between Mazel and petitioner that petitioner would receive a 10 percent interest in Professional. Mazel would retain the remaining 90 percent of the corporation. Petitioner did not receive certificates of stock of Professional. Petitioner was to operate the corporation from his office in Albuquerque, where he conducted other businesses. Mazel was to advance funds necessary to operate the business. Professional began business with a 1970 Rolls Royce automobile belonging to Mazel. Title to the car was transferred to Professional's name. Petitioner served as chief operating officer and secretary-treasurer of Professional. He was responsible for negotiating loans, paying the bills, purchasing cars, obtaining financing, and the day-to-day operation of the business, including keeping the business' books and records. Petitioner was also responsible for the maintenance of bank accounts for Professional, including writing *148 the payroll checks for the drivers and the employees of Albuquerque Cab Company working for Professional. Professional maintained two checking accounts, with Citizens Bank and Plaza del Sol National Bank. Petitioner devoted between 20 and 30 hours a week to these duties. Petitioner was assisted by the employees of his other businesses in the performance of his duties with Professional. At all times herein pertinent, Mazel was a resident of California. Mazel's participation in connection with the management or operation of Professional was limited to long distance phone calls to petitioner. The main source of deposits to the bank accounts of Professional were: (1) income from operations; (2) funds advanced by Mazel; and (3) funds advanced by petitioner. The expenses of the corporation consisted of repair expenses, salaries paid to drivers, fuel, oil, insurance, and loan repayments. During 1978, petitioner advanced [1] the following funds to Professional: Date
Account to which deposited
Amount
04/02/78
Citizens Bank
$ 670.72
04/14/78
Citizens Bank
1,175.00
05/22/78
Citizens Bank
1,000.00
05/31/78
Citizens Bank
1,000.00
07/20/78
Citizens Bank
1,000.00
07/25/78
Citizens Bank
900.00
08/21/78
Citizens Bank
2,000.00
10/03/78
Citizens Bank
1,000.00
10/17/78
Plaza del Sol Ntl. Bank
5,000.00
11/06/78
Plaza del Sol Ntl. Bank
3,500.00
11/20/78
Plaza del Sol Ntl. Bank
500.00
11/24/78
Plaza del Sol Ntl. Bank
400.00
11/29/78
Citizens Bank
1,650.00
12/11/78
Citizens Bank
650.00
12/14/78
Plaza del Sol Ntl. Bank
500.00
Total
$20,945.72
*149 Petitioner's purpose in advancing the aforesaid amounts to Professional was to enable the corporation to continue its operations and make it successful. Petitioner received the following amounts from Professional, in the form of checks, drawn on either one of the two checking accounts of Professional, signed by petitioner and payable to petitioner: [2]
Date
Form of payment
Amount
06/16/78
Check - Citizens Bank
$2,450
08/24/78
Check - Citizens Bank
2,000
08/30/78
Check - Citizens Bank
2,000
10/26/78
Check - Plaza del Sol Ntl. Bank
1,500
11/03/78
Check - Plaza del Sol Ntl. Bank
3,000
04/20/79
Check - Plaza del Sol Ntl. Bank
200
Total
$11,150
Professional acquired a 1974 Rolls Royce automobile in August 1978. The vehicle was financed by Southwest Capital Investments, Inc. (hereinafter "Southwest") under a loan agreement, dated August 18, 1978, in the original amount of $35,000. The loan agreement was entered into by Professional, as borrower, and Mazel and petitioner, as guarantors. The loan agreement *150 represented that, as of the date of the agreement, Mazel and petitioner were the primary stockholders of Professional. The loan agreement also provided that should any other party acquire more than 25 percent of the stock of Professional, that party would become a party to the loan agreement, as co-guarantor. Pursuant to the terms of the loan agreement, Professional agreed not to make wage or salary advances, in the ordinary course of business, to employees, in excess of $1,000, nor to grant any stock option to any business entity or individuals other than Mazel or petitioner. Petitioner signed the aforesaid loan agreement both as secretary of Professional and in his individual capacity. The principal sum of $35,000 plus interest of 14.5 percent per annum was payable in 59 consecutive monthly installments of $823.50, including interest, the first installment being due and payable on September 18, 1978. The loan was secured by an interest in Professional's two Rolls Royce automobiles. On October 17, 1978, petitioner signed a promissory note for $10,000, in his capacity as secretary-treasurer of Professional. The note was issued to petitioner, in his individual capacity, and *151 was payable on or before 180 days after issuance, and carried interest at 12 percent annually. The note was unsecured and unrecorded. On the same date, petitioner deposited $5,000 to Professional's checking account with Plaza del Sol National Bank, as indicated supra.
Professional's financial situation did not improve subsequent to October 1978. The promissory note from Professional, dated October 17, 1978, became due, by its terms, in April 1979. Pursuant to petitioner's request, Yudin sent the following letter to Mazel: June 13, 1979 Mr. Bernard P. Mazel, 930 Hilgard Avenue, Los Angeles, California 90024 In re: Lee Farkas Dear Bernie: Lee Farkas asked me to write to you about his interest in Professional Leasing being sold to you. He explained that you are taking over the entire operation. There is a note due Lee in the sum of $10,000.00, plus 10% interest, which is in deposit here in Albuquerque at the Plaza National Bank, and in addition he has incurred costs in the sum of $1,646.21 which is chargeable to the corporation. Therefore, upon payment of the note and his costs, he will relinquish his ten percent interest in Professional Leasing and will give you *152 a full release of any and all claims in the corporation. Would you please let me hear from you on this matter at your earliest convenience. Very truly yours, /s/ Edward L. Yudin EDWARD L. YUDIN On July 20, 1979, [3] petitioner filed suit against Professional for collection of the $10,000 promissory note plus 12 percent interest from October 17, 1978, until paid, plus attorney's fees in the amount of 10 percent of the total amount due, and an additional $1,646.21, representing certain costs allegedly incurred by petitioner on behalf of Professional, in the New Mexico District Court (hereinafter the "Farkas-Professional action"). At the time the Farkas-Professional action was filed in July 1979, Professional's assets consisted, inter alia, of two Rolls Royce automobiles, models 1970 and 1974. The 1970 Rolls Royce -- the original car with which the car leasing business was started, and which had been transferred to Professional by Mazel -- had been involved in an accident, and was inoperative. The damage to the 1970 car was covered by insurance, but the insurance proceeds had not *153 been applied to repair it. The 1974 Rolls Royce was in Los Angeles, California, in Mazel's possession. The two automobiles were security for the promissory note, dated August 18, 1978, held by Southwest. Professional had held title to two additional Rolls Royce automobiles, models 1971 and 1972, prior to July 1979, which were no longer in its possession; one of the automobiles was returned to the dealer it had been purchased from, because of a defective engine, and the other one had been sold and the proceeds applied towards payments of Professional's obligations. Petitioner was familiar with the assets of Professional. By September 1979, Professional had failed to make the required payments to Southwest on the promissory note dated August 18, 1978, and the note was in default. On September 26, 1979, Franklin Development Corporation (hereinafter "Franklin"), a New Mexico corporation engaged in investment, purchased the note and all rights thereunder for consideration. The first liens held by Southwest against the 1970 and 1974 Rolls Royce automobiles to secure payment of the note were transferred to Franklin, as well as a life insurance policy on the life of petitioner for *154 a face amount of $70,000, naming Southwest as assignee. At that time, the principal balance owing on the note was $13,901.63, plus interest at the annual rate of 14.5 percent from July 25, 1979. Franklin was owned by petitioner's mother and uncle. Prior to 1979, petitioner did not own any stock in, nor did he participate in the management or operation of Franklin. The purchase of the promissory note from Southwest by Franklin was made at petitioner's request. Subsequent to his mother's death in January 1980, petitioner became a shareholder of Franklin, through inheritance from her estate. In its answer to the Farkas-Professional action, Professional raised several defenses, counterclaimed for fraud and breach of fiduciary duty, and requested $50,000 in general damages and $50,000 in punitive damages. In January 1980, petitioner traveled to Beverly Hills, California, took the 1974 Rolls Royce, which had been in Mazel's possession, and drove the automobile back to Albuquerque. In repossessing the automobile, petitioner was acting on behalf of Franklin. Title to the two automobiles was transferred to Franklin. On February 5, 1980, Mazel, as president and shareholder of Professional, *155 filed suit against Franklin for replevin of the 1970 and 1974 Rolls Royce automobiles (hereinafter the "Professional-Franklin action") in the same New Mexico District Court. Franklin was represented by Yudin in the Professional-Franklin action. On May 21, 1980, the New Mexico District Court ordered Franklin to deliver the two Rolls Royce automobiles to Mazel and Professional upon the posting by them of a $27,513.94 deposit in the Court Registry. After the required bond was posted, titles to the two automobiles were endorsed in blank and released to the attorney for Mazel and Professional. On May 21, 1980, the parties to the Professional-Franklin action filed a joint motion with the District Court, moving the court to order that the sum of $15,031.13, representing the balance due on the promissory note dated August 18, 1978 ($12,582.67) and accrued interest to May 20, 1980 of $1,082, plus 10 percent attorney's fees ($1,366.46), be paid to Franklin by the clerk of the court, out of the $27,513.94 deposited by Mazel and Professional. The District Court approved the motion, and the clerk paid this sum to Yudin, the attorney for Franklin, on May 28, 1980. On September 26, 1980, the *156 parties to the Professional-Franklin action filed a stipulation of dismissal with prejudice of the action with the District Court, acknowledging complete settlement of their differences. On the same date, the parties to the Farkas-Professional action filed a stipulation, agreeing to the dismissal of the action, with prejudice, and acknowledged complete settlement of all claims and actions between them. The District Court on the same day issued an order dismissing both actions with prejudice. The court ordered, further, that an additional sum of $3,250 be distributed to Franklin from the balance of the monies deposited with the Court Registry ($12,482.81). The remaining balance, ($9,232.81), was to be paid to Mazel and Professional. The funds were paid in accordance with the court's order. On his Federal income tax return for the year 1979 petitioner claimed a business bad debt deduction, in the amount of $10,000, with respect to the promissory note from Professional to him. Petitioner also claimed legal expenses in the amount of $154 in connection with the Farkas-Professional action. Respondent disallowed the claimed deductions in his statutory notice of deficiency. OPINION
*157 Issue 1.Bad debt deduction.
Petitioner claims entitlement to a business bad debt loss deduction, in the amount of $9,795.92, with respect to advances made to Professional, for the taxable year 1979. In support of his contention, petitioner argues that: (1) his purpose in making the said advances to Professional was to protect his right to receive a salary; and (2) the note evidencing the debt became worthless in 1979.Alternatively, petitioner contends that he is entitled to a business bad debt deduction in 1980, or a nonbusiness bad debt deduction in 1979 or 1980. Respondent argues, in support of his disallowance of the business bad debt deduction claimed by petitioner, as follows: (1) Petitioner's advances to Professional were contributions to capital and did not constitute bona fide indebtedness; (2) even if petitioner's advances constituted loans, the loans did not become worthless in 1979 or 1980; and (3) if the advances were loans and if they became worthless in 1979 or 1980, Professional's debt to petitioner was a nonbusiness bad debt. We must first decide whether petitioner's advances to Professional are to be characterized as loans or capital contributions. If *158 they were loans, further inquiry must be made into whether and when they became worthless, and whether the loans were business or nonbusiness debts. Section 166(a)[4] allows a deduction for any debt which becomes worthless during the taxable year. Only a bona fide debt -- defined as a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money -- qualifies for deductibility. Section 1.166-1(c), Income Tax Regs.; Wortham Machinery Company v. United States,521 F.2d 160, 164 (10th Cir. 1975). No deduction may be taken for (1) a gift, or (2) a loan, repayment of which is contingent upon some event, or for a loan made without a reasonable expectation, belief, and intention that the advance be repaid. Zimmerman v. United States,318 F.2d 611 (9th Cir. 1963). Contributions to capital are not to be regarded as debt for purposes of section 166. Section 1.166-1(c), Income Tax Regs.
*159 Petitioner and Mazel agreed, orally, to organize Professional for the purpose of leasing luxury automobiles. Petitioner was to receive a 10 percent interest in Professional; Mazel was to retain the remaining 90 percent. Mazel was to provide funding for the operation, and petitioner was to run the operation. From all that appears, no certificates of stock were ever issued to petitioner or to Mazel. Petitioner represented, however, in signing the loan agreement, dated August 18, 1978, that he was a shareholder of Professional. Petitioner argues that the only reason this representation was made was because "in the event that I was going to get the stock that I was promised before the corporation was formed, if things went extremely well, maybe, then we would still be -- we would not be in violation of this loan agreement." [5] (We note that the aforementioned clause, by its terms, was to become operative upon an acquisition of more than 25 percent of Professional's stock, not 10 percent.) Petitioner also referred to his equity interest in Professional in his letter to Mazel, dated June 13, 1979 (quoted in our findings of fact, supra). *160 Given such an interest, the transaction at issue demands the kind of scrutiny regularly given debt-equity controversies. Transactions between a corporation and its shareholders require special scrutiny primarily because of the lender/shareholder's dual interest in the corporation. Texas Farm Bureau v. United States,725 F.2d 307, 310 (5th Cir. 1984); Tomlinson v. 1661 Corporation,377 F.2d 291, 297 (5th Cir. 1967). While we should not expect a creditor-shareholder to evidence behavior and motivations conforming to those of a mere creditor, we must determine whether the transaction is in substance a contribution to capital masquerading as a debt. Slappey Drive Industrial Park v. United States,561 F.2d 572, 581 (5th Cir. 1977). Our decision with respect to this issue depends upon the economic substance of the transaction and not upon the form of the advance. Gregory v. Helvering,293 U.S. 465 (1935). The nature of the advances, whether *161 loans or equity, is an ascertainment of fact. Electronic Modules Corp. v. United States,695 F.2d 1367, 1371 (Fed. Cir. 1982); Fin Hay Realty Co. v. United States,398 F.2d 694, 695 (3d. Cir. 1968); Gilbert v. Commissioner,262 F.2d 512, 513 (2d Cir. 1959), cert. denied 359 U.S. 1002 (1959); Dixie Dairies Corp. v. Commissioner,74 T.C. 476, 493 (1980). The burden of proving the reality of the loans rests on petitioner. White v. United States,305 U.S. 281, 292 (1938); Dixie Dairies Corp. v. Commissioner,supra at 493; Rule 142(a). In the course of determining whether a particular transaction creates bona fide indebtedness or equity the courts have considered various factors. See Electronic Modules Corp. v. United States,supra at 1371; Casco Bank & Trust Co. v. United States,544 F.2d 528, 531 (1st Cir. 1976)Hayutin v. Commissioner,508 F.2d 462, 472-474 (10th Cir. 1974); Estate of Mixon v. United States,464 F.2d 394, 402 (5th Cir. 1972); *162 A.R. Lantz Co. v. United States,424 F.2d 1330, 1333 (9th Cir. 1970); Diamond Bros. Co. v. Commissioner,322 F.2d 725, 731 (3rd Cir. 1963); Jewell Ridge Coal Corporation v. Commissioner,318 F.2d 695, 698 (4th Cir. 1963); Gilbert v. Commissioner,262 F.2d at 513; Meridian & Thirteenth Realty Co. v. Commissioner,132 F.2d 182, 186 (7th Cir. 1942). Amongst the factors which the courts have considered are: (1) the name given to the certificates evidencing the indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of payments; (4) the right to enforce payment of principal and interest; (5) participation in management flowing as a result; (6) the status of the contribution in relation to regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) source of interest payments; (11) the ability of the corporation to obtain loans from outside lending institutions; (12) the extent to which the advance was used to acquire capital assets; (12) the failure of the debtor to repay *163 on the due date or to seek a postponement. Estate of Mixon v. United States,supra at 402. In applying these factors to the facts herein, we are mindful that these criteria are only aids in determining whether the advances, analyzed in terms of their economic reality, constitute risk capital subject to the fortunes of the corporate venture or represent a strict debtor-creditor relationship. Fin Hay Realty Corporation v. United States,supra at 697; Dixie Dairies Corp. v. Commissioner,supra at 494. There is no one characteristic which can be said to be decisive in making the debt-equity determination. John Kelley Co. v. Commissioner,326 U.S. 521, 530 (1946). "The object of the inquiry is not to count factors, but to evaluate them." Tyler v. Tomlinson,414 F.2d 844, 848 (5th Cir. 1969). After careful analysis of the facts and circumstances surrounding petitioner's advances to Professional, we are convinced that the advances were capital contributions, placed at the risk of the business, rather than loans. Professional was formed in early 1978, Mazel transferred a 1970 Rolls *164 Royce automobile to Professional. He may have also made small capital contributions and several advances, [6] enabling Professional to commence operations. From all that appears, however, Mazel promised more than he delivered, and Professional was thinly capitalized. [7]
Petitioner was the manager of Professional, had effective control of all aspects of the business, and made the day-to-day decisions. Mazel's participation in the management and operations of Professional was limited to long-distance telephone calls that he made to petitioner. The situation continued the same before and after petitioner made the advances to Professional. Petitioner made advances to Professional, totaling $13,745.72, between April 2, 1978 and October 17, 1978. In the same period, he withdrew $6,450. The advances are not represented by notes or any other certificate evidencing indebtedness. The checks, signed by petitioner, and payable to himself do not indicate the purpose for which they were *165 paid. Between October 18 and December 31, 1978, he advanced $7,200 and withdrew $4,700. Petitioner's deposits to Professional's accounts totaled $20,945.72, and petitioner signed checks totaling $11,150, payable to himself.The outstanding balance, net of withdrawals, was $9,795.72. Petitioner advanced money to Professional without regard as to whether the advances were debt or equity, prompted by the fact that the corporation needed the funds to survive. "The giving of a note or other evidence of indebtedness which may be legally enforceable is not in itself conclusive of the existence of a bona fide debt." Estate of Van Anda v. Commissioner,12 T.C. 1158, 1162 (1949), affd. per curiam 192 F.2d 391 (2d Cir. 1951). That a promissory note was signed, and a maturity date and interest payments provided for, is not determinative, especially in view of the fact that petitioner had made several advances, prior to the signing of the note, without delivery of a note or interest provisions. The net balance of the deposits to Professional's checking accounts against *166 the checks signed by petitioner to himself was never $10,000, the principal amount of the note. Indeed, on October 17, 1978, the date on which the note was signed by petitioner and $5,000 transferred to Professional's account at Plaza del Sol National Bank, the net balance owed to petitioner was $7,295.72 (if indeed it was owed). In our opinion, petitioner's delivery of a promissory note to himself was a mere formalism designed to cover the advances that he had made as of October 17, 1978, and that he intended to continue, as needed, to insure the survival of Professional. The note was unsecured and petitioner, who had signed the loan agreement and promissory note of August 18, 1978, with Southwest, was well aware that that loan was secured by liens on the principal assets of the corporation, viz, the 1970 and 1974 Rolls Royce automobiles. Petitioner himself testified that Professional could not obtain a loan in the corporate name, even with a personal guaranty, from outside creditors in October 1978. The financial situation of Professional apparently was precarious as of October 1978. Professional had cash flow problems and the payments on the Southwest loan -- which proceeds *167 were used to purchase a 1974 Rolls Royce automobile -- were not being made on a timely basis. The financial situation of Professional did not improve subsequent to October 1978, so far as this record shows, yet petitioner continued to make advances to Professional. The note signed by petitioner, as secretary-treasurer of Professional provided for the payment of interest. No payments of interest, however, seem to have been ever made by Professional.The checks drawn on Professional's checking accounts, intended by petitioner as "partial repayment on the loans" did not contain a break-down of the items that comprised the total partial payment. A particularly important indicator in distinguishing debt from capital contributions focuses on the payment of interest. "A true lender is concerned with interest." Curry v. United States,396 F.2d 630, 634 (5th Cir. 1968), cert. denied 393 U.S. 967 (1968). See also National Carbide Corp. v. Commissioner,336 U.S. 422, 435 (1949). No provision was made concerning the source of interest payments. *168 Where repayment is possible only out of corporate earnings, the transaction has the appearance of a contribution of equity capital. Estate of Mixon v. United States,supra at 405. Payment on the note was expected by petitioner when not if the additional capital allegedly promised by Mazel was provided, after Professional's cash flow problem was straightened out, and from internally-generated revenues. Petitioner apparently knew that it was improbable that Mazel would advance any moneys to the corporation. The only feasible source of repayment was from Professional's earnings, since the major corporate assets were security on the Southwest note. The risk that the advances to Professional would not be recouped absent adequate profits is precisely the risk assumed by an equity investor. Meridian & Thirteenth Realty Co. v. Commissioner,supra at 187. Partial payments of principal were discretionarily made by petitioner. Other creditors were paid before petitioner's advances to the corporation were repaid, and, seemingly, only when sufficient *169 cash was available. When the needs of the corporation required, petitioner would advance more money to the corporation. In our opinion petitioner did not intend to create a debt relationship in advancing moneys to Professional.Issues of intent pose a purely factual question. See Pullman-Standard v. Swint,456 U.S. 273 (1982). Petitioner testified, predictably, that he intended the advances to be loans, however, as stated by the Court of Appeals for the Fifth Circuit: Tax law requires that creditorship have genuine existentiality. * * * This requires more than a declaration of intention to create an indebtedness and more than the existence of corporate paper encrusted with the appropriate nomenclatural captions. * * * We * * * look not to mere labels or to the self-serving declarations of the parties * * *. [Tyler v. Tomlinson,414 F.2d 844, 850; citation omitted.] Petitioner's self-serving manifestation of a subjective intent does not alter the relationship created by his objectively indicated intent. Petitioner testified as follows: *170 Q. What was the purpose of yuor [sic] making the deposits, represented by the stipulation exhibits -- supplemental stipulation exhibits 20(t) through 34(hh)? A. All these checks and money that I put in was to -- because he [Mazel] wouldn't put the money in to keep the operation going, I had to do it myself. Or, I couldn't find any alternative but to do it myself. * * * Q. Was it your intent that by advancing the $10,000.00 to Professional Leasing, you could get the business off the ground? A. Get it off the ground? Q. Make it a successful business? A. More successful than it was, yes. Petitioner argues that in making the advances herein at issue he was trying to protect his right to receive a salary, citing Trent v. United States,291 F.2d 669 (2d Cir. 1961), and Anderson v. Commissioner,555 F.2d 236 (9th Cir. 1977). The cases cited by petitioner are inapposite to the facts herein. The advances at issue in Trent and Anderson were in fact loans, as distinguished from capital contributions, for which the taxpayers expected to be repaid. Further, even assuming, arguendo, that petitioner has established the existence *171 of a bona fide debt, we are not convinced that petitioner was an employee of Professional. Petitioner's only "evidence" in support of his status as an employee of Professional was his uncorroborated testimony that Mazel had agreed to pay him "initially $1,000 a month and hopefully more" for his services. We note that petitioner signed checks, drawn on Professional's checking accounts, payable to himself, apparently as partial repayment of the advances; the record, however, does not show that payments of the alleged salary were ever made. Petitioner failed to prove that the alleged unpaid salary was accrued as a liability on the books of the corporation.[8] Petitioner testified that he kept the books and records of the corporation. His failure to present them to corroborate his claim permits us to draw the inference that they would not support his contention. Wichita Terminal Elevator Co. v. Commissioner,162 F.2d 513 (10th Cir. 1947). Having decided that petitioner's "loan" of $10,000 to Professional of October 17, 1978, was an equity investment rather than a true loan, we need not consider *172 whether it was "business" or "nonbusiness," nor if and when it became worthless. [9]
Issue 2. Legal Fees:
Petitioner claimed a deduction, in the amount of $154, for legal fees allegedly incurred in connection with the claimed business bad debt. Petitioner has the burden of proving all elements of the claimed deduction, and that respondent's determination is incorrect. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Petitioner has failed to carry his burden of proving that the said legal fees were incurred and of substantiating their payment. Thus, petitioner is not entitled to a deduction for legal fees. * * * In order to reflect (1) our holdings for respondent with respect to petitioner's claimed bad debt deduction and claimed legal fees, (2) petitioner's concessions with respect other issues, and (3) the parties' agreement to be bound by the final decision in Casey v. Commissioner,supra, *173 entry of decision herein must be deferred. An appropriate order will be issued.
Footnotes
1. We use the word "advance" herein for lack of a better term.↩
2. The checks do not indicate the purpose for which they were paid.↩
3. Apparently, there was no reply to the Yudin letter, or the reply was unsatisfactory.↩
4. All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
5. The clause in the Southwest loan agreement, referred to by petitioner, provided as follows: The BORROWER and/or GUARANTOR warrant that as of the date of this Loan Agreement, Lee B. Farkas and Bernard P. Mazel↩ are the primary stockholders of BORROWER. BORROWER and/or GUARANTOR further warrant that should any other party acquire more than twenty-five percent (25%) of the stock of BORROWER, that party will become a party to this Loan Agreement as CO-GUARANTOR.
6. The record is devoid of any evidence regarding the amount and timing of Mazel's contributions and advances. ↩
7. Petitioner did not introduce any evidence as to what the original capitalization was.↩
8. Professional's books and records were not introduced in evidence.↩
9. Petitioner did not claim entitlement to a deduction for a loss under sec. 165 with respect to his investment in Professional.↩